ZSCHERNIG ET AL. *v.* MILLER, ADMINIS-
TRATOR, ET AL.

No. 21. Argued November 7, 1967.—
Decided January 15, 1968.

*Peter A. Schwabe, Sr.,* argued the cause for appellants.
With him on the briefs was *Peter A. Schwabe, Jr.*

*Wayne M. Thompson,* Assistant Attorney General of
Oregon, argued the cause for appellee State Land Board
of Oregon. With him on the brief was *Robert Y. Thorn-
ton,* Attorney General.

Briefs of *amici curiae* were filed by *Solicitor General
Marshall, Acting Assistant Attorney General Eardley,
John S. Martin, Jr.,* and *Alan S. Rosenthal* for the United
States, and by *Edward Mosk* for Slaff, Mosk & Rudman.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case concerns the disposition of the estate of a resident of Oregon who died there intestate in 1962. Appellants are decedent's sole heirs and they are residents of East Germany. Appellees include members of the State Land Board that petitioned the Oregon probate court for the escheat of the net proceeds of the estate under the provisions of Ore. Rev. Stat. § 111.070 (1957),[1] which provides for escheat in cases where a nonresident alien claims real or personal property unless three requirements are satisfied:

(1) the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the foreign country;

---

[1] "(1) The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"(a) Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant or citizen;

"(b) Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"(c) Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.

"(2) The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection (1) of this section.

"(3) If such reciprocal rights are not found to exist and if no heir, devisee or legatee other than such alien is found eligible to take such property, the property shall be disposed of as escheated property."

(2) the right of United States citizens to receive payment here of funds from estates in the foreign country; and

(3) the right of the foreign heirs to receive the proceeds of Oregon estates "without confiscation."

The Oregon Supreme Court held that the appellants could take the Oregon realty involved in the present case by reason of Article IV of the 1923 Treaty of Friendship, Commerce and Consular Rights with Germany [2] (44 Stat. 2135) but that by reason of the same Article, as construed in *Clark* v. *Allen*, 331 U. S. 503, they could not take the personalty. 243 Ore. 567, 592, 412 P. 2d 781, 415 P. 2d 15. We noted probable jurisdiction. 386 U. S. 1030.

---

[2] Article IV provides:

"Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn.

"Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases."

The Department of Justice, appearing as *amicus curiae,* submits that, although the 1923 Treaty is still in force, *Clark* v. *Allen* should be overruled insofar as it construed the personalty provision of Article IV. That portion of Article IV speaks of the rights of "[n]ationals of either High Contracting Party" to dispose of "their personal property of every kind within the territories of the other." That literal language and its long consistent construction, we held in *Clark* v. *Allen,* "does not cover personalty located in this country and which an American citizen undertakes to leave to German nationals." 331 U. S., at 516.

We do not accept the invitation to re-examine our ruling in *Clark* v. *Allen.* For we conclude that the history and operation of this Oregon statute make clear that § 111.070 is an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress. See *Hines* v. *Davidowitz,* 312 U. S. 52, 63.

As already noted [3] one of the conditions of inheritance under the Oregon statute requires "proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying *in this state without* confiscation, in whole or in part, by the governments of such foreign countries," the burden being on the nonresident alien to establish that fact.

This provision came into Oregon's law in 1951. Prior to that time the rights of aliens under the Oregon statute were defined in general terms of reciprocity,[4] similar to the California Act which we had before us in *Clark* v. *Allen,* 331 U. S., at 506, n. 1.

We held in *Clark* v. *Allen* that a general reciprocity clause did not on its face intrude on the federal domain.

[3] *Supra,* n. 1.
[4] Ore. Comp. L. Ann. § 61–107 (1940).

331 U. S., at 516–517. We noted that the California statute, then a recent enactment, would have only "some incidental or indirect effect in foreign countries." *Id.,* at 517.[5]

Had that case appeared in the posture of the present one, a different result would have obtained. We were there concerned with the words of a statute on its face, not the manner of its application. State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, albeit there is a remote possibility that any holding may disturb a foreign nation—whether the matter involves commercial cases, tort cases, or some other type of controversy. At the time *Clark* v. *Allen* was decided, the case seemed to involve no more than a routine reading of foreign laws. It now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have

---

[5] In *Clark* v. *Allen,* 331 U. S. 503, the District Court had held the California reciprocity statute unconstitutional because of legislative history indicating that ·the purpose of the statute was to prevent American assets from reaching hostile nations preparing for war on this country. *Crowley* v. *Allen,* 52 F. Supp. 850, 853 (D. C. N. D. Calif.). But when the case reached this Court, petitioner contended that the statute was invalid, not because of the legislature's motive, but because on its face the statute constituted "an invasion of the exclusively Federal field of control over our foreign relations." In discussing how the statute was applied, petitioner noted that a California court had accepted as conclusive proof of reciprocity the statement of a foreign ambassador that reciprocal rights existed in his nation. Brief for petitioner in *Clark* v. *Allen,* No. 626, October Term 1946, pp. 73–74. Thus we had no reason to suspect that the California statute in *Clark* v. *Allen* was to be applied as anything other than a general reciprocity provision requiring just matching of laws. Had we been reviewing the later California decision of *Estate of Gogabashvele,* 195 Cal. App. 2d 503, 16 Cal. Rptr. 77, see n. 6, *infra,* the additional problems we now find with the Oregon provision would have been presented.

launched inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called "rights" are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.

In a California case, involving a reciprocity provision, the United States made the following representation:

> "The operation and effect of the statute is inextricably enmeshed in international affairs and matters of foreign policy. The statute does not work disinheritance of, or affect ownership of property in California by, any group or class, but on the contrary operates in fields exclusively for, and preempted by, the United States; namely, the control of the international transmission of property, funds, and credits, and the capture of enemy property. The statute is not an inheritance statute, but a statute of confiscation and retaliation." *In re Bevilacqua's Estate,* 161 P. 2d 589, 593 (Dist. Ct. App. Cal.), superseded by 31 Cal. 2d 580, 191 P. 2d 752.

In its brief *amicus curiae,* the Department of Justice states that: "The government does not . . . contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations."

The Government's acquiescence in the ruling of *Clark* v. *Allen* certainly does not justify extending the principle of that case, as we would be required to do here to uphold the Oregon statute as applied; for it has more than "some incidental or indirect effect in foreign countries,"

and its great potential for disruption or embarrassment makes us hesitate to place it in the category of a diplomatic bagatelle.

As we read the decisions that followed in the wake of *Clark* v. *Allen,* we find that they radiate some of the attitudes of the "cold war," where the search is for the "democracy quotient" of a foreign regime as opposed to the Marxist theory.[6]   The Oregon statute introduces the concept of "confiscation," which is of course opposed to the Just Compensation Clause of the Fifth Amendment.   And this has led into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received delivery of funds should "not preclude wonderment as to how many may have been denied 'the right to receive' . . . ."  ,See *State Land Board* v. *Kolovrat,* 220 Ore. 448, 461–462, 349 P. 2d 255, 262, rev'd *sub nom. Kolovrat* v. *Oregon,* 366 U. S. 187, on other grounds.

---

[6] See *Estate of Gogabashvele,* 195 Cal. App. 2d 503, 16 Cal. Rptr. 77, disapproved in *Estate of Larkin,* 65 Cal. 2d 60, 416 P. 2d 473, and *Estate of Chichernea,* 66 Cal. 2d 83, 424 P. 2d 687. One commentator has described the *Gogabashvele* decision in the following manner:

"The court analyzed the general nature of rights in the Soviet system instead of examining whether Russian inheritance rights were granted equally to aliens and residents.  The court found Russia had no separation of powers, too much control in the hands of the Communist Party, no independent judiciary, confused legislation, unpublished statutes, and unrepealed obsolete statutes.  Before stating its holding of no reciprocity, the court also noted Stalin's crimes, the Beria trial, the doctrine of crime by analogy, Soviet xenophobia, and demonstrations at the American Embassy in Moscow unhindered by the police.  The court concluded that a leading Soviet jurist's construction of article 8 of the law enacting the R. S. F. S. R. Civil Code seemed modeled after Humpty Dumpty, who said, 'When I use a word . . . , it means just what I choose it to mean—neither more nor less.' "   Note, 55 Calif. L. Rev. 592, 594–595, n. 10 (1967).

That kind of state involvement in foreign affairs and international relations—matters which the Constitution entrusts solely to the Federal Government—is not sanctioned by *Clark* v. *Allen*. Yet such forbidden state activity has infected each of the three provisions of § 111.070, as applied by Oregon.

In *State Land Board* v. *Pekarek*, 234 Ore. 74, 378 P. 2d 734, the Oregon Supreme Court in ruling against a Czech claimant because he had failed to prove the "benefit" requirement of subsection (1)(c) of the statute said:

> "Assuming, without deciding, that all of the evidence offered by the legatees was admissible, it can be given relatively little weight. The statements of Czechoslovakian officials must be judged in light of the interest which they had in the acquisition of funds for their government. Moreover, in judging the credibility of these witnesses we are entitled to take into consideration the fact that declarations of government officials in communist-controlled countries as to the state of affairs existing within their borders do not always comport with the actual facts."
> *Id.*, at 83, 378 P. 2d, at 738.

Yet in *State Land Board* v. *Schwabe*, 240 Ore. 82, 400 P. 2d 10, where the certificate of the Polish Ambassador was tendered against the claim that the inheritance would be confiscated abroad, the Oregon court, appraising the current attitude of Washington, D. C., toward Warsaw, accepted the certificate as true. *Id.*, at 84, 400 P. 2d, at 11.

In *State Land Board* v. *Rogers*, 219 Ore. 233, 347 P. 2d 57, the court held Bulgarian heirs had failed to prove the requirement of what is now § (1)(b) of the reciprocity statute, the "right" of American heirs of Bulgarian decedents to get funds out of Bulgaria into the United States. Such transmission of funds required a license from the Bulgarian National Bank, but the

court held the fact that licenses were regularly given insufficient, because they were issued only at the discretion or "whim" of the bank. *Id.*, at 245, 347 P. 2d, at 63.[7]

As one reads the Oregon decisions, it seems that foreign policy attitudes, the freezing or thawing of the "cold war," and the like are the real desiderata.[8]  Yet they of

---

[7] The *Rogers* case, we are advised, prompted the Government of Bulgaria to register a complaint with the State Department, as disclosed by a letter of November 20, 1967, written by a State Department adviser to the Oregon trial court stating: "The Government of Bulgaria has raised with this Government the matter of difficulties reportedly being encountered by Bulgarian citizens resident in Bulgaria in obtaining the transfer to them of property or funds from estates probated in this country, some under the jurisdiction of the State of Oregon. . . ."

[8] Such attitudes are not confined to the Oregon courts. Representative samples from other States would include statements in the New York courts, such as "This court would consider sending money out of this country and into Hungary tantamount to putting funds within the grasp of. the Communists," and "If this money were turned over to the Russian authorities, it would be used to kill our boys and innocent people in Southeast Asia. . . ."  Heyman, The Nonresident Alien's Right to Succession Under the "Iron Curtain Rule," 52 Nw. U. L. Rev. 221, 234 (1957).  In Pennsylvania, a judge stated at the trial of a case involving a Soviet claimant that "If you want to say that I'm prejudiced, you can, because when it comes to Communism I'm a bigoted anti-Communist."  And another judge exclaimed, "I am not going to send money to Russia where it can go into making bullets which may one day be used against my son."  A California judge, upon being asked if he would hear argument on the law, replied, "No, I won't send any money to Russia."  The judge took "judicial notice that Russia kicks the United States in the teeth all the time," and told counsel for the Soviet claimant that "I would think your firm would feel it honor bound to withdraw as representing the Russian government.  No American can make it too strong."  Berman, Soviet Heirs in American Courts, 62 Col. L. Rev. 257, and n. 3 (1962).

A particularly pointed attack was made by Judge Musmanno of the Pennsylvania Supreme Court, where he stated with respect to the Pennsylvania Act that:

"It is a commendable and salutary piece of legislation because it provides for the safekeeping of these funds even with accruing

course are matters for the Federal Government, not for local probate courts.

This is as true of (1)(a) of § 111.070 as it is of (1)(b) and (1)(c). In *Clostermann* v. *Schmidt,* 215 Ore. 55, 332 P. 2d 1036, the court—applying the predecessor of

interest, in the steelbound vaults of the Commonwealth of Pennsylvania until such time as the Iron Curtain lifts or sufficiently cracks to allow honest money to pass through and be honestly delivered to the persons entitled to them. Otherwise, wages and other monetary rewards faithfully earned under a free enterprise democratic system could be used by Communist forces which are committed to the very destruction of that free enterprising world of democracy." *Belemecich Estate,* 411 Pa. 506, 508, 192 A. 2d 740, 741, rev'd, *sub nom. Consul General of Yugoslavia* v. *Pennsylvania,* 375 U. S. 395, on authority of *Kolovrat* v. *Oregon,* 366 U. S. 187.

And further:

". . . Yugoslavia, as the court below found, is a satellite state where the residents have no individualistic control over their destiny, fate or pocketbooks, and where their politico-economic horizon is raised or lowered according to the will, wish or whim of a self-made dictator." 411 Pa., at 509, 192 A. 2d, at 742.

"All the known facts of a Sovietized state lead to the irresistible conclusion that sending American money to a person within the borders of an Iron Curtain country is like sending a basket of food to Little Red Ridinghood in care of her 'grandmother.' It could be that the greedy, gluttonous grasp of the government collector in Yugoslavia does not clutch as rapaciously as his brother confiscators in Russia, but it is abundantly clear that there is no assurance upon which an American court can depend that a named Yugoslavian individual beneficiary of American dollars will have anything left to shelter, clothe and feed himself once he has paid financial involuntary tribute to the tyranny of a totalitarian regime." *Id.,* at 511, 192 A. 2d, at 742–743.

Another example is a concurring opinion by Justice Doyle in *In re Hosova's Estate,* 143 Mont. 74, 387 P. 2d 305:

"In this year of 1963, the Central Committee of the Communist Party of the U. S. S. R. issued the following directive to all of its member[s], 'We fully stand for the destruction of imperialism and capitalism. We not only believe in the inevitable destruction of

(1)(a)—held that not only must the foreign law give inheritance rights to Americans, but the political body making the law must have "membership in the family of nations" (*id.*, at 65, 332 P. 2d, at 1041), because the purpose of the Oregon provision was to serve as "an inducement to foreign nations to so frame the inheritance laws of their respective countries in a manner which would insure to Oregonians the same opportunities to inherit and take personal property abroad that they enjoy in the state of Oregon." *Id.*, at 68, 332 P. 2d, at 1042.

In *In re Estate of Krachler,* 199 Ore. 448, 263 P. 2d 769, the court observed that the phrase "reciprocal right" in what is now part (1)(a) meant a claim "that is enforceable by law." *Id.*, at 455, 263 P. 2d, at 773. Although certain provisions of the written law of Nazi Germany appeared to permit Americans to inherit, they created no "right," since Hitler had absolute dictatorial powers and could prescribe to German courts rules and procedures at variance with the general law. Bequests " 'grossly opposed to sound sentiment of the people' " would not be given effect. *Id.*, at 503, 263 P. 2d, at 794.[9]

---

capitalism, but also are doing everything for this to be accomplished by way of the class struggle, and *as soon as possible.*'

"Hence, in affirming this decision the writer is knowingly contributing financial aid to a Communist monolithic satellite, fanatically dedicated to the abolishing of the freedom and liberty of the citizens of this nation.

"By reason of self-hypnosis and failure to understand the aims and objective of the international Communist conspiracy, in the year 1946, Montana did not have statutes to estop us from making cash contributions to our own ultimate destruction as a free nation." *Id.*, at 85–86, 387 P. 2d, at 311.

[9] In *Mullart* v. *State Land Board,* 222 Ore. 463, 353 P. 2d 531, the court had little difficulty finding that reciprocity existed with Estonia. But it took pains to observe that in 1941 Russia "moved in and overwhelmed it [Estonia] with its military might. At the same time the Soviet hastily and cruelly deported about 60,000 of its people to Russia and Siberia and, in addition, exterminated

In short, it would seem that Oregon judges in construing § 111.070 seek to ascertain whether "rights" protected by foreign law are the same "rights" that citizens of Oregon enjoy. If, as in the *Rogers* case, the alleged foreign "right" may be vindicated only through Communist-controlled state agencies, then there is no "right" of the type § 111.070 requires. The same seems to be true if enforcement may require approval of a Fascist dictator, as in *Krachler.* The statute as construed seems to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own.

It seems inescapable that the type of probate law that Oregon enforces affects international relations in a persistent and subtle way. The practice of state courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious.[10] The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy. See Miller, The Corporation as a Private Government in the

---

many of its elderly residents. This policy of destroying or decimating families and rendering normal economic life chaotic continued long afterward." *Id.,* at 467, 353 P. 2d, at 534.

"[A]ny effort to communicate with persons in Estonia exposes such persons to possible death or exile to Siberia. It seems that the Russians scrutinize all correspondence from friends of Estonians in lands where freedom prevails and subject the recipient to suspicion of a relationship inimical to the Soviet. . . . This line of testimony has the support of reliable historical matter of which we take notice. We mention it as explaining the futility of attempting, under the circumstances, to secure more cogent evidence than hearsay in the matter." *Id.,* at 476, 353 P. 2d, at 537–538.

[10] See Berman, Soviet Heirs in American Courts, 62 Col. L. Rev. 257 (1962); Chaitkin, The Rights of Residents of Russia and its Satellites to Share in Estates of American Decedents, 25 S. Cal. L. Rev. 297 (1952).

World Community, 46 Va. L. Rev. 1539, 1542–1549 (1960). Where those laws conflict with a treaty, they must bow to the superior federal policy. See *Kolovrat* v. *Oregon,* 366 U. S. 187. Yet, even in absence of a treaty, a State's policy may disturb foreign relations. As we stated in *Hines* v. *Davidowitz, supra,* at 64: "Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." Certainly a State could not deny admission to a traveler from East Germany nor bar its citizens from going there. *Passenger Cases,* 7 How. 283; cf. *Crandall* v. *Nevada,* 6 Wall. 35; *Kent* v. *Dulles,* 357 U. S. 116. If there are to be such restraints, they must be provided by the Federal Government. The present Oregon law is not as gross an intrusion in the federal domain as those others might be. Yet, as we have said, it has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems.

The Oregon law does, indeed, illustrate the dangers which are involved if each State, speaking through its probate courts, is permitted to establish its own foreign policy.

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN joins, concurring.

While joining the opinion of the Court, I would go further. Under the Oregon law involved in this case, a foreigner cannot receive property from an Oregon decedent's estate unless he first meets the burden of proving, to the satisfaction of an Oregon court, that his

country (1) grants to United States citizens a "reciprocal right" to take property on the same terms as its own citizens; (2) assures Americans the right "to receive payment" here of funds originating from estates in that country; and (3) gives its own citizens the "benefit, use or control" of property received from an Oregon estate "without confiscation, in whole or in part." The East German claimants in this case did not show in the Oregon courts that their country could meet any one of these criteria. I believe that all three of the statutory requirements on their face are contrary to the Constitution of the United States.

In my view, each of the three provisions of the Oregon law suffers from the same fatal infirmity. All three launch the State upon a prohibited voyage into a domain of exclusively federal competence. Any realistic attempt to apply any of the three criteria would necessarily involve the Oregon courts in an evaluation, either expressed or implied, of the administration of foreign law, the credibility of foreign diplomatic statements, and the policies of foreign governments. Of course state courts must routinely construe foreign law in the resolution of controversies properly before them, but here the courts of Oregon are thrust into these inquiries only because the Oregon Legislature has framed its inheritance laws to the prejudice of nations whose policies it disapproves and thus has trespassed upon an area where the Constitution contemplates that only the National Government shall operate. "For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." *Chinese Exclusion Case,* 130 U. S. 581, 606. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field

affecting foreign relations be left entirely free from local interference." *Hines* v. *Davidowitz,* 312 U. S. 52, 63.

The Solicitor General, as *amicus curiae,* says that the Government does not "contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations." But that is not the point. We deal here with the basic allocation of power between the States and the Nation. Resolution of so fundamental a constitutional issue cannot vary from day to day with the shifting winds at the State Department. Today, we are told, Oregon's statute does not conflict with the national interest. Tomorrow it may. But, however that may be, the fact remains that the conduct of our foreign affairs is entrusted under the Constitution to the National Government, not to the probate courts of the several States. To the extent that *Clark* v. *Allen,* 331 U. S. 503, is inconsistent with these views, I would overrule that decision.

MR. JUSTICE HARLAN, concurring in the result.

Although I agree with the result reached in this case, I am unable to subscribe to the Court's opinion, for three reasons. *First,* by resting its decision on the constitutional ground that this Oregon inheritance statute infringes the federal foreign relations power, without pausing to consider whether the 1923 Treaty of Friendship, Commerce and Consular Rights with Germany [1] itself vitiates this application of the state statute, the Court has deliberately turned its back on a cardinal principle of judicial review. *Second,* correctly construed the 1923 treaty, in my opinion, renders Oregon's application of its statute in this instance impermissible, thus requiring reversal of the state judgment. *Third,* the Court's

---

[1] Dec. 8, 1923, 44 Stat. 2132, T. S. No. 725.

constitutional holding, which I reach only because the majority has done so, is in my view untenable. The impact of today's holding on state power in this field, and perhaps in other areas of the law as well, justifies a full statement of my views upon the case.

## I.

Even in this age of rapid constitutional change, the Court has continued to proclaim adherence to the principle that decision of constitutional issues should be avoided wherever possible.[2] In his celebrated concurring opinion in *Ashwander* v. *Valley Authority,* 297 U. S. 288, 341, Mr. Justice Brandeis listed the self-imposed rules by which the Court has avoided the unnecessary decision of constitutional questions. In his fourth rule he dealt with the situation presented by this case, declaring that:

> "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175, 191; *Light* v. *United States,* 220 U. S. 523, 538." *Id.,* at 347.[3]

The above rule should control the disposition of this case, for there is what I think must be regarded, within

---

[2] See, *e. g., Giles* v. *Maryland,* 386 U. S. 66, 80–81; *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 316; *Bell* v. *Maryland,* 378 U. S. 226, 237; *Communist Party* v. *Catherwood,* 367 U. S. 389, 392; *Poe* v. *Ullman,* 367 U. S. 497, 503; *Machinists* v. *Street,* 367 U. S. 740, 749.

[3] See also *Alma Motor Co.* v. *Timken Co.,* 329 U. S. 129, 136–137.

the meaning of *Ashwander,* as a nonconstitutional ground
on which the decision could be founded. Although the
appellants chose to argue only the constitutional ques-
tion, the United States, as *amicus curiae,* forcefully, and
I believe correctly, contended that the full relief sought
by the appellants should be afforded by overruling the
construction of the 1923 treaty, rather than the consti-
tutional holding, in *Clark* v. *Allen,* 331 U. S. 503. The
Court simply states that "[w]e do not accept the invita-
tion to re-examine our ruling in *Clark* v. *Allen.*" See
*ante,* at 432. I believe that the principle of avoiding
unnecessary constitutional adjudication obliges us to
accept that invitation and to inquire whether the treaty
might provide an adequate alternative ground for afford-
ing the appellants their due.[4]

## II.

Article IV of the 1923 treaty with Germany provides:

"Where, on the death of any person holding real
or other immovable property or interests therein
within the territories of one High Contracting Party,
such property or interests therein would, by the laws
of the country or by a testamentary disposition,
descend or pass to a national of the other High Con-
tracting Party, whether resident or non-resident,
were he not disqualified by the laws of the country
where such property or interests therein is or are
situated, such national shall be allowed a term of
three years in which to sell the same, this term to

---

[4] It is true, of course, that the treaty would displace the Oregon
statute only by virtue of the Supremacy Clause of the Consti-
tution. Yet I think it plain that this fact does not render inappli-
cable the teachings of *Ashwander.* Disposition of the case pursuant
to the treaty would involve no interpretation of the Constitution,
and this is what the *Ashwander* rules seek to bring about. Cf. *Swift
& Co., Inc.* v. *Wickham,* 382 U. S. 111, 126–127.

be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn.

"Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases."

In *Clark* v. *Allen, supra,* this Court considered the application of this treaty provision to a case much like the present one. In *Clark* one who was apparently an American citizen died in California and left her real and personal property to German nationals. The California Probate Code provided that

"The rights of aliens not residing within the United States . . . to take either real or personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and

conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries." Cal. Prob. Code § 259, added by Stats. 1941, c. 895, § 1.

The *Clark* Court first considered whether the 1923 treaty with Germany had survived the events of the years 1923–1947. It concluded that the treaty was still in effect and that it clearly entitled the German citizens to take the real estate left them by the decedent.

The Court then went on to discuss the application of the treaty to personalty. It noted that a practically identical provision of a treaty with Wurttemburg had been held in the 1860 case of *Frederickson* v. *Louisiana*, 23 How. 445, not to govern "[t]he case of a citizen or subject of the respective countries residing at home, and disposing of [personal] property there in favor of a citizen or subject of the other . . . ," *id.*, at 447, and that the *Frederickson* decision had been followed in 1917 cases involving three other treaties.[5] The Court then said:

"The construction adopted by those cases is, to say the least, permissible when the syntax of the sentences dealing with realty and personalty is considered. So far as realty is concerned, the testator includes 'any person'; and the property covered is that within the territory of either of the high contracting parties. In case of personalty, the provision governs the right of 'nationals' of either contracting party to dispose of their property within

---

[5] *Petersen* v. *Iowa*, 245 U. S. 170; *Duus* v. *Brown*, 245 U. S. 176; *Skarderud* v. *Tax Commission*, 245 U. S. 633.

the territory of the 'other' contracting party; and it is 'such personal property' that the 'heirs, legatees and donees' are entitled to take.

"Petitioner, however, presents a detailed account of the history of the clause which was not before the Court in *Frederickson* v. *Louisiana, supra,* and which bears out the construction that it grants the foreign heir the right to succeed to his inheritance or the proceeds thereof. But we do not stop to review that history. For the consistent judicial construction of the language since 1860 has given it a character which the treaty-making agencies have not seen fit to alter. And that construction is entirely consistent with the plain language of the treaty. We therefore do not deem it appropriate to change that construction at this late date, even though as an original matter the other view might have much to commend it." 331 U. S., at 515–516.

In the case now before us, an American citizen died in Oregon, leaving property to relatives in East Germany. An Oregon statute conditioned a nonresident alien's right to inherit property in Oregon upon the existence of a reciprocal right of American citizens to inherit in the alien's country upon the same terms as citizens of that country; upon the right of American citizens to receive payment within the United States from the estates of decedents dying in that country; and upon proof that the alien heirs of the American decedent would receive the benefit, use, and control of their inheritance without confiscation.[6] The Oregon Supreme Court affirmed the finding of the trial court that the evidence did not establish that American citizens were accorded reciprocal rights to take property from or to receive the proceeds of East German estates. How-

---

[6] The statute appears in the majority opinion in n. 1, *ante,* at 430.

ever, it found that the 1923 treaty was still effective with respect to East Germany, and consequently held that under *Clark* v. *Allen* the East German heirs must be permitted to take the real, though not the personal, property despite the Oregon statute.

I, too, believe that the 1923 treaty is still applicable to East Germany.[7] However, I am satisfied that *Clark* v. *Allen* should not be followed insofar as the Court there held that the words of the 1923 treaty must be taken to bear the meaning ascribed to them in *Frederickson* v. *Louisiana* because of the "consistent judicial construction of the language since 1860." This reasoning assumes both that the drafters of the 1923 treaty knew of the *Frederickson* decision and that they thought *Frederickson* would control the interpretation of that treaty. The first assumption seems open to substantial doubt, and the second is not beyond question.

There is evidence that in 1899, almost 40 years after the *Frederickson* decision, the State Department's treaty draftsmen were not aware of the meaning given to the crucial treaty language in that opinion. For in 1895 the British Ambassador initiated correspondence with the State Department in which he proposed a treaty which would assure that "no greater charges [would] be imposed . . . on real or personal property in the United States inherited by British subjects, whether domiciled within the union or not, than are imposed upon prop-

---

[7] The appellees argue that a substantial part of the 1923 treaty has been terminated or abrogated by the 1954 Treaty of Friendship, Commerce and Navigation with the Federal Republic of Germany, 7 U. S. T. 1839, T. I. A. S. No. 3593. However, Article XXVI of the 1954 treaty specifies that it extends only to "all areas of land and water under the sovereignty or authority of" the Federal Republic of Germany, and to West Berlin. The United States does not challenge the holding of the Oregon Supreme Court that the 1923 treaty still applies to East Germany. See Brief for the United States as *amicus curiae* 6, n. 5.

erty inherited by American citizens," in return for provisions assuring to American citizens reciprocal rights in Great Britain.[8]   The ensuing treaty of 1899 [9] contained language substantially identical to that in the subsequent 1923 treaty with Germany.   Since it is highly unlikely that the British Ambassador intended that British subjects should be able to inherit personal property from American decedents only if those decedents happened also to be British subjects, or that the State Department so understood him, it is clear enough that the draftsmen in 1899 must have been unaware of *Frederickson.*

It is also conceivable that the drafters of the 1923 treaty thought that *Frederickson* was inapplicable to that treaty.   Because the article of the Wurttemburg treaty dealing with realty was not brought to the attention of the *Frederickson* Court, the *Frederickson* decision was based largely upon the Court's understanding that

> "The case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other, was not in the contemplation of the contracting Powers, and is not embraced in this article of the treaty."   23 How., at 447–448.

Hence, the drafters of the 1923 treaty might have assumed that *Frederickson* was not applicable to that treaty, in which the inclusion of the realty provision made it clear that the parties did consider the case of a citizen dying in his own country.   In view of these indications that the draftsmen of the 1923 treaty very likely did not intend that the words of the treaty should bear the meaning given them in *Frederickson,* it seems to me

---

[8] 125 Notes from Great Britain, Sept. 24, 1895, MSS., Nat. Archives.

[9] Treaty of March 2, 1899, with Great Britain, 31 Stat. 1939.

that the Court in *Clark* v. *Allen* erred in holding the question foreclosed. Accordingly, a *de novo* inquiry into the meaning of the treaty seems entirely appropriate.

### III.

The language of Article IV of the 1923 treaty with Germany, which was quoted earlier, is based upon Article X of the treaty of 1785 with Prussia.[10] Article X provided:

> "The citizens or subjects of each party shall have power to dispose of their personal goods within the jurisdiction of the other, by testament, donation or otherwise; and their representatives, being subjects or citizens of the other party, shall succeed to their said personal goods . . . and dispose of the same at their will, paying such dues only as the inhabitants of the country wherein the said goods are, shall be subject to pay in like cases. . . . And where, on the death of any person holding real estate within the territories of the one party, such real estate would by the laws of the land descend on a citizen or subject of the other, were he not disqualified by alienage, such subject shall be allowed a reasonable time to sell the same, and to withdraw the proceeds without molestation, and exempt from all rights of detraction on the part of the government of the respective states."

This part of the treaty with Prussia was in turn founded upon earlier treaties with France, the Netherlands, and Sweden.[11] The treaty of 1778 with France

---

[10] July, Aug., Sept., 1785, 8 Stat. 88.

[11] See Art. XI, Treaty of Feb. 6, 1778, with France, 8 Stat. 18; Art. VI, Treaty of Oct. 8, 1782, with the Netherlands, 8 Stat. 36; Art. VI, Treaty of April 3, 1783, with Sweden, 8 Stat. 64.

452

specifically freed American citizens from the burdens of two restrictions on the right of aliens to dispose of or inherit property which were then common in the civil law countries: the *droit d'aubaine* and the *droit de détraction*. The *droit d'aubaine* was the feudal right of the sovereign to appropriate the property of an alien who died within the realm; an aspect of this doctrine was "the complementary incapacity of an alien to inherit, even from a citizen." *Nielsen v. Johnson*, 279 U. S. 47, 55, n. 2.[12] The *droit d'aubaine* was replaced during the 18th century by the *droit de détraction*, a tax "imposed on the right of an alien to [inherit] . . . the property of persons dying within the realm," *Nielsen v. Johnson, supra*, at 56, n. 2, and levied upon the removal of the inherited property by the alien from the decedent's country.[13]

The 1782 treaty with the Netherlands and the 1783 treaty with Sweden were framed more generally. They provided that:

> "The subjects of the contracting parties in the respective states, may freely dispose of their goods and effects either by testament, donation or otherwise, in favour of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession . . . ."[14]

The 1785 treaty with Prussia, which is substantially identical to the 1923 treaty, differed from the earlier treaties in two important respects. For one thing, it dealt

---

[12] See also 3 Vattel, The Law of Nations or the Principles of Natural Law § 112, at 147–148 (1916 ed.); Wheaton, Elements of International Law § 82, at 115–116 (1866 ed.).

[13] See Borchard, Diplomatic Protection of Citizens Abroad § 39, at 88 (1916 ed.); 4 Miller, Treaties and other International Acts of the United States of America 547 (1934).

[14] The quotation is from the Swedish treaty. The wording of the Dutch treaty differs only slightly.

separately with realty and with personalty.[15] This separate treatment stemmed from the fact that at common law aliens could freely inherit personalty but could not succeed to realty.[16] The Continental Congress, apparently fearing that under the Articles of Confederation it lacked power thus to alter the laws of the States, instructed the Commissioners who negotiated the treaty "[t]hat no rights be stipulated for aliens to hold real property within the States, this being utterly inadmissible by their several laws and policy," but that a person who would inherit realty but for his alienage should be permitted to sell the property and withdraw the proceeds within a reasonable time.[17]

The other important difference was that the provision of the Prussian treaty dealing with the disposal and inheritance of personalty, though generally based upon the corresponding language in the Dutch and Swedish treaties, was altered by the addition of the phrase "within the jurisdiction of the other," so as to read:

> "The citizens or subjects of each party shall have power to dispose of their personal goods *within the jurisdiction of the other,* by testament, donation or otherwise, and their representatives, being subjects or citizens of the other party, shall succeed to their said personal goods . . . and dispose of the same at their will, paying such dues only as the inhabitants of the country wherein the said goods are, shall be subject to pay in like cases. . . ." (Emphasis added.)

---

[15] The earlier treaties used the words "effects" and "goods," which have been held to include realty. *Todok* v. *Union State Bank,* 281 U. S. 449, 454.

[16] See 1 Blackstone, Commentaries 372; 2 Kent, Commentaries 61–63.

[17] See XXVI Journals of the Continental Congress 357, 360–361.

There is no precise indication why this phrase was added. Its function seems to have been to define more clearly than the earlier treaties the cases in which disposition of property required protection from the *droit d'aubaine,* namely those instances when property was disposed of in a country other than that of the citizenship of the owner. Under this construction, the phrase would modify the word "dispose" rather than the words "personal goods" (or "personal property" in the 1923 treaty). The right of succession would be unaffected, since the words "said personal goods" (or "such personal property" in the 1923 treaty) would refer to all "personal goods" (or to "personal property of every kind" in the 1923 treaty) and not merely to those personal goods within the territory of the other party to the treaty.

Several factors point to the conclusion that this construction is correct, and that the phrase "within the jurisdiction of the other" was not intended to modify the words "personal goods" and thereby to limit the right of succession. The addition of the phrase "within the jurisdiction of the other" was unrelated to the problem of freeing rights of succession from the *droit de détraction,* since that exaction was imposed upon succession by an alien to the property of any person dying within the realm, regardless of the citizenship of the decedent. The phrase therefore cannot have been intended to modify the right of succession in order to enlarge or contract this freedom.

Moreover, the terms of the newly added real property clause affirmatively indicate that the "personal goods" clause of the 1785 treaty (and therefore the "personal property" clause of the 1923 treaty) was intended to confer the right to inherit personal property from both alien and citizen decedents. The first draft of the 1785 treaty was substantially similar to the earlier Dutch and Swedish treaties, and quite clearly would have permit-

ted aliens to succeed to real or personal property regardless of whether the decedent died in his own country.[18] However, as noted earlier, the Continental Congress out of caution instructed the Commissioners that aliens should not be allowed by the treaty to succeed to and hold real estate but should be limited to sale of the land and removal of the proceeds. This indicates that the real estate clause was intended purely as a limitation on the rights accorded with respect to personal property and was not supposed to confer any greater rights. The real property clause certainly permitted inheritance from both alien and citizen, for it allowed succession "on the death of any person holding real estate." This was acknowledged by the Court in *Clark* v. *Allen, supra,* at 517, with respect to the 1923 treaty. It would seem to follow that the more liberal personal property clause was also intended to allow inheritance regardless of the decedent's nationality.

The conclusion that the personal property clause of the 1785 (and hence of the 1923) treaty was intended to grant a right of inheritance no matter what the decedent's citizenship finds additional support in the State Department's interpretations of similar treaty provisions during the 19th century. When negotiating substantially identical provisions in treaties with German states in the 1840's, the then Minister to Prussia, Mr. Wheaton, indicated his belief that the proposed treaties would protect "naturalized Germans, resident in the U[nited] States, who are entitled to inherit the property of their relations deceased in Germany." [19] There was no sug-

---

[18] See 2 Diplomatic Correspondence of the United States 1783–1789, at 111, 116–117.

[19] Despatch, Wheaton to Legare, June 14, 1843, 3 Despatches, Prussia, No. 226, MSS., Nat. Archives; see 4 Miller, Treaties and other International Acts of the United States of America 547–548 (1934).

gestion that the treaties would apply only to real property or, with respect to personal property, only to the small class of naturalized Germans whose "relations" in Germany happened also to be American citizens. In responding to Mr. Wheaton, the State Department instructed him to take as his "general guide" the treaty with Prussia and others similarly worded, and instructed him that the object should be "the removal of all obstructions . . . to the withdrawal from the one country, by the citizens or subjects of the other, of any property which may have been transferred to them by . . . will,— or which they may have inherited *ab intestato*." [20]

Later in the century, after the *Frederickson* decision, the State Department several times indicated that it regarded similarly worded treaties as assuring citizens of one country the right to inherit personal property of citizens of the other dying in their own country. In 1868 and 1880 the Department asserted, under a similarly worded treaty,[21] the right of American citizens to inherit personal property of Swiss decedents who died in Switzerland.[22] In 1877, it took the same position with respect to the rights of Russian heirs to inherit the personal property of American decedents under a like treaty with Russia.[23] The negotiations leading to the British treaty of 1899, which have previously been described, reveal the same attitude.

This course of history, coupled with the general principle that "where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging,

[20] 4 Miller, *supra*, at 546, 548.

[21] Treaty of Nov. 25, 1850, with Switzerland, 11 Stat. 587, 590.

[22] See Diplomatic Correspondence of the United States, 1868, Pt. II, 194, 196–197; Foreign Relations of the United States, 1880, 952–953.

[23] See 4 Moore, Digest of International Law 6 (1906). The treaty was the Treaty of Dec. 18, 1832, with Russia, 8 Stat. 444.

rights which may be claimed under it, the more liberal interpretation is to be preferred," [24] leads in my opinion to the conclusion that Article IV of the 1923 treaty should be construed as guaranteeing to citizens of the contracting parties the right to inherit personal property from a decedent who dies in his own country. I would overrule *Frederickson* v. *Louisiana, supra,* and *Clark* v. *Allen, supra,* insofar as they hold the contrary. Considerations of *stare decisis* should not stand in the way of rectifying two decisions that rest on such infirm foundations. Compare *Swift & Co., Inc.* v. *Wickham,* 382 U. S. 111, with *Kesler* v. *Department of Public Safety,* 369 U. S. 153. Properly construed, the 1923 treaty, which of course takes precedence over the Oregon statute under the Supremacy Clause, entitles the appellants in this case to succeed to the personal as well as the real property of the decedent despite the state statute.

## IV.

Upon my view of this case, it would be unnecessary to reach the issue whether Oregon's statute governing inheritance by aliens amounts to an unconstitutional infringement upon the foreign relations power of the Federal Government. However, since this is the basis upon which the Court has chosen to rest its decision, I feel that I should indicate briefly why I believe the decision to be wrong on that score, too.

As noted earlier, the Oregon statute conditions an alien's right to inherit Oregon property upon the satisfaction of three conditions: (1) a reciprocal right of Americans to inherit property in the alien's country; (2) the right of Americans to receive payment in the United States from the estates of decedents dying in

---

[24] *Bacardi Corp.* v. *Domenech,* 311 U. S. 150, 163, citing *Jordan* v. *Tashiro,* 278 U. S. 123, 127; *Nielsen* v. *Johnson,* 279 U. S. 47, 52.

the alien's country; and (3) proof that the alien heirs of the Oregon decedent would receive the benefit, use, and control of their inheritance without confiscation. In *Clark* v. *Allen, supra,* the Court upheld the constitutionality of a California statute which similarly conditioned the right of aliens to inherit upon reciprocity but did not contain the other two restrictions. The Court in *Clark* dismissed as "farfetched" the contention that the statute unconstitutionally infringed upon the federal foreign relations power. See 331 U. S., at 517. The Court noted that California had not violated any express command of the Constitution by entering into a treaty, agreement, or compact with foreign countries. It said that "[w]hat California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line." *Ibid.*

It seems to me impossible to distinguish the present case from *Clark* v. *Allen* in this respect in any convincing way. To say that the additional conditions imposed by the Oregon statute amount to such distinctions would be to suggest that while a State may legitimately place inheritance by aliens on a reciprocity basis, it may not take measures to assure that reciprocity exists in practice and that the inheritance will actually be enjoyed by the person whom the testator intended to benefit. The years since the *Clark* decision have revealed some instances in which state court judges have delivered intemperate or ill-advised remarks about foreign governments in the course of applying such statutes, but nothing has occurred which could not readily have been foreseen at the time *Clark* v. *Allen* was decided.

Nor do I believe that this aspect of the *Clark* v. *Allen* decision should be overruled, as my Brother STEWART would have it. Prior decisions have established that in the absence of a conflicting federal policy or viola-

tion of the express mandates of the Constitution the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations.[25]   Application of this rule to the case before us compels the conclusion that the Oregon statute is constitutional.   Oregon has so legislated in the course of regulating the descent and distribution of estates of Oregon decedents, a matter traditionally within the power of a State.   See *ante,* at 440.   Apart from the 1923 treaty, which the Court finds it unnecessary to consider, there is no specific interest of the Federal Government which might be interfered with by this statute.   The appellants concede that Oregon might deny inheritance rights to all nonresident aliens.[26]   Assuming that this is so, the statutory exception permitting inheritance by aliens whose countries permit Americans to inherit would seem to be a measure wisely designed to avoid any offense to foreign governments and thus any conflict with general federal interests: a foreign government can hardly object to the denial of rights which it does not itself accord to the citizens of other countries.

The foregoing would seem to establish that the Oregon statute is not unconstitutional on its face.   And in fact the Court seems to have found the statute unconstitutional only as applied.   Its notion appears to be that application of the parts of the statute which require that reciprocity actually exist and that the alien heir actually be able to enjoy his inheritance will inevitably

---

[25] See, *e. g., Clarke* v. *Deckebach,* 274 U. S. 392; *Frick* v. *Webb,* 263 U. S. 326; *Webb* v. *O'Brien,* 263 U. S. 313; *Terrace* v. *Thompson,* 263 U. S. 197; *Heim* v. *McCall,* 239 U. S. 175.

[26] Brief for Appellants 13.   Thus, this case does not present the question whether a uniform denial of rights to nonresident aliens might be a denial of equal protection forbidden by the Fourteenth Amendment.   Cf. *Blake* v. *McClung,* 172 U. S. 239, 260–261.

involve the state courts in evaluations of foreign laws and governmental policies, and that this is likely to result in offense to foreign governments. There are several defects in this rationale. The most glaring is that it is based almost entirely on speculation. My Brother DOUGLAS does cite a few unfortunate remarks made by state court judges in applying statutes resembling the one before us. However, the Court does not mention, nor does the record reveal, any instance in which such an occurrence has been the occasion for a diplomatic protest, or, indeed, has had any foreign relations consequence whatsoever.[27] The United States says in its brief as *amicus curiae* that it

> "does not . . . contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States' conduct of foreign relations." [28]

At an earlier stage in this case, the Solicitor General told this Court:

> "The Department of State has advised us . . . that State reciprocity laws, including that of Oregon, have had little effect on the foreign relations and policy of this country. . . . Appellants' apprehension of a deterioration in international relations, unsubstantiated by experience, does not constitute the kind of 'changed conditions' which might call for re-examination of *Clark* v. *Allen*." [29]

---

[27] The communication from the Bulgarian Government mentioned in the majority opinion in n. 7, *ante*, at 437, apparently refers not to intemperate comments by state-court judges but to the very existence of state statutes which result in the denial of inheritance rights to Bulgarians.

[28] Brief for the United States as *amicus curiae* 6, n. 5.

[29] Memorandum for the United States 5.

Essentially, the Court's basis for decision appears to be that alien inheritance laws afford state court judges an opportunity to criticize in dictum the policies of foreign governments, and that these dicta may adversely affect our foreign relations. In addition to finding no evidence of adverse effect in the record, I believe this rationale to be untenable because logically it would apply to many other types of litigation which come before the state courts. It is true that, in addition to the many state court judges who have applied alien inheritance statutes with proper judicial decorum,[30] some judges have seized the opportunity to make derogatory remarks about foreign governments. However, judges have been known to utter dicta critical of foreign governmental policies even in purely domestic cases, so that the mere possibility of offensive utterances can hardly be the test.

If the flaw in the statute is said to be that it requires state courts to inquire into the administration of foreign law, I would suggest that that characteristic is shared by other legal rules which I cannot believe the Court wishes to invalidate. For example, the Uniform Foreign Money-Judgments Recognition Act provides that a foreign-country money judgment shall not be recognized if it "was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law."[31] When there is a dispute as to the content of foreign law, the court is required under the common law to treat the question as one of fact and to consider any evidence presented as to the actual administration of the foreign legal system.[32] And in the field of choice of law there is a nonstatutory

[30] See, *e. g., Estate of Larkin*, 65 Cal. 2d 60, 416 P. 2d 473.

[31] Uniform Foreign Money-Judgments Recognition Act § 4 (a) (1), 9B Unif. Laws Ann. 67.

[32] See generally Schlesinger, Comparative Law 31–143 (2d ed. 1959).

rule that the tort law of a foreign country will not be applied if that country is shown to be "uncivilized." [33] Surely, all of these rules possess the same "defect" as the statute now before us. Yet I assume that the Court would not find them unconstitutional.

I therefore concur in the judgment of the Court upon the sole ground that the application of the Oregon statute in this case conflicts with the 1923 Treaty of Friendship, Commerce and Consular Rights with Germany.

Mr. Justice White, dissenting.

I would affirm the judgment below. Generally for the reasons stated by Mr. Justice Harlan in Part IV of his separate opinion, I do not consider the Oregon statute to be an impermissible interference with foreign affairs. Nor am I persuaded that the Court's construction of the 1923 treaty in *Clark* v. *Allen*, 331 U. S. 503 (1947), and of similar treaty language in earlier cases should be over-ruled at this late date.

---

[33] See *Slater* v. *Mexican National R. Co.*, 194 U. S. 120, 129 (Holmes, J.); *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 355–356 (Holmes, J.); *Cuba R. Co.* v. *Crosby*, 222 U. S. 473, 478 (Holmes, J.); *Walton* v. *Arabian American Oil Co.*, 233 F. 2d 541, 545.