**Adams Estate**

*James N. Peck* and *Harry L. Green, Jr.,* for claimants.

*Richard N. Spare,* for Commonwealth.

TAXIS, P. J., June 6, 1969.—By an adjudication dated July 28, 1964, this court awarded the balance for distribution in this estate, in the amount of $10,287.18, to the Commonwealth under section 737 of the Fiduciaries Act of April 18, 1949, P. L. 512, to be held without escheat for the benefit of the claimants herein according to the provisions of that act. This petition now seeks distribution of the said amount to the claimants.

The section referred to is known as "The Iron Curtain Act," and its constitutionality has been in grave doubt since the Supreme Court of the United States decided Zschernig v. Miller, 389 U.S. 429. The opinion in that case contained very far-reaching language, although the Oregon statute involved was considerably different from section 737. However, the holding of Zschernig was considered with reference to the Pennsylvania statute in Struchmanczuk Estate, 44 D. & C. 2d 155, 18 Fiduc. Rep. 186, a decision of the Orphans' Court of Philadelphia dated April 17, 1968. That court concluded that section 737 was unconstitutional, and we completely agree with the reasoning of President Judge Klein therein. Therefore, we would order the distribution herein requested without hesitation, except that the Commonwealth has presented additional objections to the same.

The Commonwealth takes the position that the

claimants have not established either their identity or their kinship with sufficient certainty to be entitled to distribution. In reply to this, petitioners make two points. The first is that in the aforesaid adjudication this court found that the present claimants were the heirs of decedent, and that this finding was not challenged or appealed at that time by the Commonwealth. We might dispose of the case on this point, for the acceptance of distribution under section 737 by the Commonwealth in 1964 would seem to have involved recognition of the present claimants as proper distributees save for the fact that they lived in an Iron Curtain country. See Bokey Estate, 412 Pa. 244, 253. However, petitioners contend secondly that their proof of heirship is adequate; since we agree, we prefer to rest the decision there.

From a consideration of kindred cases, we have determined that the burden of proof is evidence ". . . so clear, precise, and definite in quality and quantity as to satisfy the court below that the relationship claimed existed": Link Estate (No. 1), 319 Pa. 513; Krepinevich Estate, 433 Pa. 78. This means in a case of intestacy, as here, that a claimant must prove his identity and his kinship with decedent, and also must produce satisfactory proof that others of equal or closer kinship are not available to inherit. In Krepinevich Estate, supra, at page 82, the court said, with reference to the claim of an alleged widow to decedent's entire estate, that ". . . appellant must prove (1) that she is the decedent's widow and (2) that the decedent was not survived by any issue, parent, brother, sister, child of a brother or sister, grandparent, uncle or aunt."

The present claimants allege that they are the nephews and niece of decedent, and his sole heirs. Accordingly, this first requires proof of the alleged kinship and claimants' identity, and then proof that

decedent left no surviving spouse, issue, parents, brothers, sisters, grandparents, uncles, aunts, and also no other nieces or nephews. We examine the evidence from this viewpoint.

Much difficulty here stems from the difficult and inconsistent spellings of translated Eastern European names, which must first be reconciled in order to identify specifically the various persons involved in the Adams family tree. When this is done, however, little doubt remains that claimants' position has been substantiated.

First to be considered is the joint deposition of Petras Petro Yakonis and Petras Vintsento Grinkiavichus, taken on July 27, 1965, and authenticated by a senior notary and a member of the Supreme Court of the Lithuanian SSR. The deposition recites that the deponents, born respectively in 1901 and 1908, were well acquainted with the Adomaitis family during their entire lives. The deponents are not related to the family, however, and are not interested in the estate. In summary, the deposition states that decedent, known as Pranas, was born in 1894, one of two children born to Ionas Baltromeiaus Adomaitis and Ona, his wife (nee Voitekauskaite), the other child being Romanas, a son, also called Eronimas and Romualdas. Decedent's father died in World War I in 1915, and his mother died in Lithuania in 1933. Decedent came to the United States shortly before World War I, and here married, but was predeceased by his wife.

The deposition then sets forth that decedent's brother, Romanas, was married one time, to the mother of the three claimants herein. Romanas had no other children, either natural or adopted, and died in 1947. Further facts concerning this marriage, and a detailed explanation of the varied names identifying Romanas, are contained in a further deposition by one of the claimants, Bronius Romualdo Adomaitis.

(Testimony by claimant is admissible here, as the issue involved is one of devolution only and the Act of 1887 does not apply.) Some of the variation in names undoubtedly results from an unfortunate lack of precision in these old records, but the depositions indicate that decedent's brother was variously known as Romauldas Iono, Eronimas, Romualdas, and Iono Eronimas. This is further bolstered by the certificates of birth of the three claimants, which name the claimants as they are presently known and which state the claimants' mother to be "Angele Tomoshiunaite" in each case without variation, although their father is variously identified. Decedent's brother died in 1947, according to a certificate of death dated August 27, 1965.

As noted, decedent was married and widowed prior to his death. That he was childless does not actually appear from the records submitted; but decedent resided in this country for 50 years, and any children would have been native born and presumably well known. The Commonwealth does not suggest any possibility of direct issue in its arguments.

Thus, we find that all substantial contingencies which could exclude claimants as sole heirs have been met or explained. Decedent left no wife, children or parents; grandparents or even uncles or aunts may be presumed too aged to survive, and the Commonwealth has raised no objection based on these degrees of possible relatives; and as to siblings, decedent had only one brother, now deceased, who was survived by the claimants here. It now only remains to deal with the quality of the evidence in the light of the circumstances of this case.

The proof is exclusively documentary. As pointed out numerous times by the courts. documentary proof is not the equivalent of live testimony in probative value, if for no other reason than loss of the opportu-

nity to crossexamine. See Martinzik Estate, 25 D. & C. 2d 701. However, claimants are residents of a distant country, and the total amount of their claims is not by present standards a great amount of money. Unlike most of the cases involving disputed inheritances, there are here no competing claims by other alleged heirs, and claimants' opposition comes only from the Commonwealth which claims custody of the funds under the Act of April 9, 1929, P. L. 343, sec. 1314, 72 PS §1314. In general, where ex parte affidavits have been held inadmissible, it was because they are not the best evidence, and this is obviously so when the affiants could testify in person. See Link Estate (No. 1), supra. It seems evident in this case, however, that from a realistic standpoint the documents are the best evidence which claimants can make available.

Some of the cases relied upon by the Commonwealth to discredit the claimants' affidavits seem to involve a broad and general distrust by the courts of anything of a documentary nature produced by Iron Curtain countries. In Martinzik Estate, supra, the court dealt with material which it characterized as ". . . the work of an agent of a Russian governmental system which stops at nothing by way of deceit, forgery or other misrepresentation to acquire American dollars . . . the devious practices of the Soviet government and its representatives are no doubt much more advanced than were those of the Hitler government in Germany." In Mackarus Estate, (No. 3) 41 D. & C. 2d 267, 273, the court said:

"Where the documents depend for their authenticity upon officials or functionaries who must act under police-state pressures, no such convincing assurance (of their validity) is possible. We can place no reliance upon documents prepared by such officials, and governmental verification does not add to the authenticity or validity of the documents."

Since Zschernig v. Miller, supra, we doubt our right to reject evidence solely because of the political system of the country of its preparation; but, be that as it may, even before that decision, this Commonwealth had a statute (Act of April 27, 1876, P. L. 49, sec. 1, 28 PS §223) which required us to accord prima facie recognition to the official acts and exemplifications by foreign notaries, if performed in accordance with the laws of their countries and authenticated by an American consul. The recognition to be given is, of course, confined to the official acts and, for example, in the case of an affidavit, does not require us to accept the content of the affidavit. But here, the births of the claimants, decedent and his brother, and the deaths of decedent and his brother have been so officially certified and authenticated. While these documents do not contain all of claimants' evidence, they, and the balance of the proof which credibly fits in with the evidence contained in them, are entitled to credence.

The Commonwealth and the court note that the certification of death of decedent's father and brother come from records apparently prepared on August 27, 1965, which not only was long after the occurrences to which they relate, but also after claimants' first request for distribution had been made. This tends to weaken the probative effect of these documents, as it would any document, but we will not assume that official records would be falsified for purposes of this claim, and we observe that even our own official records in this respect may be established, amended or corrected long after the fact, by submission of proper evidence. The deposition of the two disinterested witnesses also corroborates the records. To a considerable extent, the material with which we are dealing has survived one or two world wars and numerous political upheavals, and must be

evaluated in that light; from an overall consideration of the facts presented, we are convinced that the claimants' burden has been met.

The Commonwealth has relied upon Bokey Estate, 412 Pa. 244, but there again the court was confronted with conflicting claims to the estate by several different family members. More important, the Supreme Court demonstrated in its detailed opinion that the evidence was inconclusive as to whether the claimant was the cousin or the brother of decedent, that other evidence indicated that decedent had sisters whose current status was not indicated at all, and that claimant had failed to show that his own brother and sister were no longer alive. We think this suffices to distinguish Bokey Estate from the present controversy.

And now, June 6, 1969, it is hereby ordered and decreed that the balance for distribution in the custody of the Commonwealth of Pennsylvania, Board of Finance and Review be distributed to James N. Peck, Esq., attorney of record for the claimants, Bronius Romualdo Adomaitis, Klemensas Eronimo Adomaitis, and Marie Romualdo Adomaititie, after the deduction of such Pennsylvania inheritance tax as may be due.