### (June 14, 1971)

In the Matter of the Estate of NATALIE DANILCHENKO, Deceased. IRVING TRUST COMPANY et al., Respondents; ULTIMATE CHARITABLE BENE-FICIARIES et al., Appellants.— Memorandum. Decree of the Surrogate's Court, Dutchess County, dated August 6, 1970, which construed the testatrix' will, after a nonjury trial, affirmed, with separate bills of costs to all parties appearing and filing separate briefs, payable out of the estate. Considered in the abstract, the dissenting opinion of our learned Brother Benjamin is extremely persuasive, but we are here confronted with a will which provides that "the determination, in good faith, by my Executor of any question presented by this provision [whether any legatee would not, because of residence in a foreign country or state, have the benefit or use or control of the money or other property to be distributed to him or her] shall be conclusive and binding". The Surrogate has found as a fact, after a plenary hearing, that the executor's determination that the foreign beneficiaries could have the benefit or use or control of the legacies bequeathed to them under the will was made in good faith and that SCPA 2218 did not act as a bar to present payment of the bequests. That, in our opinion, ends the matter. The determination therefore should be affirmed.

BENJAMIN, J. (dissenting). I respectfully dissent. In my view the opinion of my learned colleagues in supporting the court below is tantamount to a judicial repeal of SCPA 2218. The record does not support such a result in contravention of the public policy of our State. Likewise is it in contravention of the law and the public policy of our State to hold that good faith alone, on the part of an executor, bars judicial intervention.

It is my further view that the determination of the executor herein that the total legacies should go to the Soviet legatees was an improvident and unreasonable exercise of discretion. In any event, regardless of the view of the executor, we must give effect to section 2218 and remand the matter to the Surrogate for an appropriate determination by him in the light of that section.

The applicable sections of the will are contained in paragraphs "FOURTH" and "FIFTH" thereof and read as follows:

"FOURTH: All the rest residue and remainder of my estate of whatsoever kind and wheresoever situate, I give, devise and bequeath as follows, subject, however, to the provisions of Article FIFTH of this my Last Will and Testament:

" (a) One half to my sister, DARE ZOTOVA-VERNER if she survives me; otherwise to my brother, FLOR ZOTOVA, and if he also predeceases me, then to his issue surviving me in equal shares *per stirpes*.

" (b) One half to my brother, FLOR ZOTOVA, if he survives me; otherwise to his issue surviving me in equal shares *per stirpes*.

"FIFTH: If, at my death, it shall appear, to my Executor in its sole and uncontrolled judgment, that any legatee designated in Article FOURTH of this my Last Will and Testament would not, because of residence in a foreign country or state, have the benefit or use or control of the money or other property if distributed to him or her, I direct that he or she shall be deemed to have predeceased me, and I further direct that any share or portion of my estate

which shall not be effectively disposed of by the aforesaid Article FOURTH, shall be paid over in equal shares to the organizations receiving the legacies provided by Article THIRD hereof.

" In the exercise of its judgment pursuant to this provision, any doubt shall be resolved by my Executor against any alien legatee not residing within the United States or its territories and the determination, in good faith, by my Executor of any question presented by this provision shall be conclusive and binding upon every legatee or other person interested in my estate."

SCPA 2218 in pertinent part reads as follows:

" 2. Where it shall appear that a beneficiary would not have the benefit or use or control of the money or other property due him or where other special circumstances make it desirable that such payment should be withheld the decree may direct that such money or property be paid into court for the benefit of the beneficiary or the person or persons who may thereafter appear entitled thereto. The money or property so paid into court shall be paid out only upon order of the court or pursuant to the order or judgment of a court of competent jurisdiction.

" 3. In any such proceeding where it is uncertain that an alien beneficiary or fiduciary not residing within the United States, the District of Columbia, the Commonwealth of Puerto Rico or a territory or possession of the United States would have the benefit or use or control of the money or property due him the burden of proving that the alien beneficiary will receive the benefit or use or control of the money or property due him shall be upon him or the person claiming from, through or under him."

The impact of both the will and SCPA 2218 requires determination herein.

The testatrix, Natalie Danilchenko, was a childless widow living in Dutchess County, New York. Her only relatives were a brother, Flor Zotov, a sister, Daria Zotova-Verner, and a number of children and grandchildren of brother Flor Zotov, all of whom lived in the U.S.S.R. Brother Flor was a beekeeper, sister Daria a retired school teacher, and both were in their seventies, living in Uzbek, an Asiatic state of the U.S.S.R.

In 1960 the testatrix made the will, giving $5,000 apiece to seven domestic charities and the residue to her brother and sister in equal shares. The will further provided that the gift to her brother would pass to his issue if he predeceased the testatrix; and that the gift to her sister would pass to the brother if the sister predeceased the testatrix and to the brother's issue if both siblings predeceased the testatrix.

The testatrix died on September 18, 1967, leaving a net residuary estate of approximately $450,000. Both her brother and sister survived her and are still living in the U.S.S.R. A month after the testatrix' death the executor-bank offered the will for probate and at the same time moved for construction of the will. In its moving petition the executor said that on information and belief none of the residuary legatees " would, as of September 18, 1967 [the date of the testatrix' death], receive the benefit or use or control of funds * * * distributed to them from the decedent's estate " because of their residence in the U.S.S.R. The Surrogate admitted the will to probate and severed the construction proceeding for later determination. Seven months later the executor amended its petition for construction by averring that after it filed its original petition it conducted an investigation and, on the basis of that investigation, it now concluded that the U.S.S.R. legatees would have the use, benefit and control of their legacies and were therefore entitled to them. The executor then moved for summary judgment. The motion was denied and a hearing held to determine whether there had been a good-faith exercise of the executor's

discretionary authority, particularly in light of the will's admonition that any doubt be resolved against the U.S.S.R. legatees. After the hearing, the Surrogate confirmed the executor's determination and directed distribution of the residuary legacies to the U.S.S.R. legatees. Certain of the domestic charities have appealed.

In my opinion, the Surrogate's determination was incorrect and should be reversed.

The hearing was obfuscated by the circumstance that all of the contestants were attempting to dispose of the controversy on wholly disparate issues and none of the litigants agreed with respect to what the issues were to be determined by the Surrogate. The bank, acting as executor, was concerned with merely obtaining a decision that, if in good faith it had made a determination that the Soviet legatees could take in compliance with the conditions of the will, its fiduciary responsibility was properly performed and that the question of the reasonableness of its determination was not relevant as long as it had acted in good faith. The appealing American philanthropies, substitute legatees, were principally concerned with their contention that, if the bank found it necessary to inquire as to whether conditions in the Soviet made it possible for the legatees there to take consonant with the provisions of the will, that alone created such an area of doubt as to preclude the moneys going to anyone other than the substitute legatees. Particularly was that so, they contended, because of the intial doubts expressed by the executor-bank prior to the making of the investigation which it subsequently ordered. The Soviet legatees, represented by the same law firm which generally appears in all such litigations in this State, desired a determination that SCPA 2218 was in fact a dead letter with respect to Soviet legatees and that a finding of power to *control the moneys by gift or bequest* was a sufficient satisfaction of the provisions of the statute relating to the ability to use, benefit or control the legacy, regardless of whether or not in fact a fund of this size could be beneficially used and enjoyed by the legatees. Their position is that, if they have the right to give away the money or bequeath it, even though they were unable to spend it because of conditions prevailing in the Soviet Union, this was nevertheless sufficient compliance with both the conditions of the will and those contained in SCPA 2218. In this jungle of the conflicting purposes of the contending advocates, the Surrogate was faced with the necessity to arrive at an appropriate determination and it is understandable that, in such confusion, error resulted.

The expert witness who testified for the executor at the hearing had testified for the foreign legatees' counsel on prior occasions; and has generally testified that such foreign legatees could enjoy their legacies. At this hearing he testified that Soviet Law permits legatees of American funds to receive, use and control their legacies and also to make gifts of such funds and bequeath them by will. But he conceded that in 1967 (when the testatrix died) he was unsure what the effects of so large a legacy would be and whether it was within the range of possible purchases for the legatee's benefit. And the actual fact is (as recently reported in the American press) that the U.S.S.R. has a drastic shortage of consumer goods, so there would seem to be little, if anything, of substantial cost that these aged legatees could buy with their large bequests during their few remaining years of life. Moreover, it is common knowledge that in the U.S.S.R. the finer and more costly consumer goods, housing accommodations, cars and the like are reserved for government officials and the more important members of the Party and the community; and that simple ordinary people like these legatees would certainly not be allowed to obtain them even if they had the money. Inevitably, then, the bulk of these legacies could not and would not be

used by the legatees during their lifetimes and would pass to others by gift or bequest.

The exhibits in this case are particularly illuminating. Uncertain as to whether the aged brother and sister, residents in the Soviet Union, could be given the legacy, the bank sought and obtained advice from counsel as to what to do under the circumstances and were advised to institute a construction proceeding in connection with its probate proceeding, so that the Surrogate could advise it as to whether it had the right to distribute the money to the foreign legatees or was under the duty to distribute it to the substitute residuary legatees. The bank sought further advice from the Department of State and the General Counsel of the Treasury. The answers received were not sufficiently informative. Following these inquiries, which failed to resolve its doubts, it then decided to engage an expert, Professor Harold J. Berman of the Harvard Law School, to advise and guide it in the matter. Its letter to him, dated December 6, 1967, assumes great significance in its inquiry as to whether in truth and fact there was a reasonable basis for determining that there was *no doubt* of the ability of the foreign legatees to have the benefit, use and control of the legacies in question. The following paragraphs in that letter assume special significance:

" As I have previously indicated, we estimate the residuary estate at $450,000. If Daria has predeceased the testatrix the entire amount would become payable to Flor, subject to our discretionary power. I gather from our conversation that you feel that a Soviet legatee of $5,000 would in fact be able to enjoy the benefit/use/control of the legacy. If you do not believe the subject legatees could enjoy legacies of the size involved in our estate it might be helpful if you could give us an idea of where you would draw the line. In such case you might feel obliged to explain the examples cited in Note 8 of your article in Columbia Law Review Volume 62; 257, particularly the case of the estate of Artur Huss.

" Any facts supporting your opinion which may be drawn from your personal knowledge and experience will be especially helpful and if it is not too much trouble I would think a recitation of your qualifications as an expert on this question would be appropriate."

Professor Berman's written reply, dated December 22, 1967, was most illuminating on the issues herein and I quote from it as follows:

" I understand that a special question arises in the present case, however, concerning what in fact would be the practical consequences of sending a very large estate, amounting to approximately $500,000, to Soviet heirs who are living in relatively humble circumstances. In view of the fact that in general, despite legal protection of gifts and inheritances, the official Soviet political theory is hostile to large accumulations of wealth not derived from the labor of the person owning such wealth, it is asked whether it would be embarrassing to two individuals such as Flor Zotova and Daria Zotova, each of whom (judging from their letters) is almost certainly living on less than two or three hundred rubles per month, and probably less than one hundred rubles per month, suddenly to receive the equivalent, at the official rate of exchange, of over 400,000 rubles, and the equivalent in purchasing power (at the special foreign currency stores) of over a million rubles, and whether such embarrassment, if it should exist, would impel them to take steps to relinquish the benefit of a substantial portion of the bequest.

" These are hypothetical questions which are very difficult to answer with assurance. I could well imagine that a particular Soviet citizen receiving so large a sum of money might say to himself: ' Why do I need so much money?

And why should I risk the criticism of others, who might say that it is wrong for me to keep so large an amount? I shall give most of it to the Government, so that no one can accuse me of doing anything improper.' On the other hand, I could also imagine another Soviet citizen simply adding such a bequest to his savings, or perhaps using it for charitable purposes. The Soviet writer Korneichuk, for example, who has earned millions of rubles in royalties, some years ago established a public library in his native village to be supported out of his own private means.

"Even apart from bequests to such wealthy Soviet citizens, it would appear to me that no question of embarassment would arise where the amount sent to the Soviet heir is within the range of possible purchases for his own benefit, additions to his savings for expenditure at a later time, and gifts to his relatives and friends. Even the humblest Soviet citizen could without any possible embarrassment, use a gift or bequest of, say, $10,000 to enhance his own personal living standard; indeed, such an amount could be exhausted by him immediately by the purchase of an automobile, a cooperative apartment, a country house, furniture, household appliances, clothing, and the like. A Soviet citizen who is not in the humblest circumstances could use much more than $10,000 relatively inconspicuously, simply for himself; many Soviet professors whom I know personally have savings amounting in value to much more than $10,000 (in rubles).

"It is my opinion that the wishes of the testator in the Danilchenko estate could best be fulfilled if someone were sent to Tashkent and Samarkand to talk with the heirs in order to determine their particular circumstances and their particular desires with respect to the bequests made to them. If the clause in the will is interpreted to mean that the Executor is to make an independent determination not only of 'benefit, use, and control' in general but also of the extent of such benefit, use, and control in the particular case, then it would be proper for the Executor to inquire specifically of Flor Zotov and Daria Zotova concerning the actual benefits which they would derive from the receipt of a particular sum of money. It might appear that they would not be benefitted by the receipt of more than a certain amount. Such a conclusion might be based not only on what they say but also on the actual circumstances of their lives, as perceived by an objective observer who is sufficiently knowledgeable about Soviet conditions to make an informed judgment."

The residuary legatees contend that this opinion was in itself sufficient to cast a reasonable doubt upon the ability of the foreign legatees to take. Subsequently, however, Professor Berman was hired to go to the Soviet Union to make a personal investigation, including interviewing the brother and sister. The report submitted by him upon his return is likewise illuminating.

The interviews were significant. They were arranged by co-operation of the law firm representing the foreign legatees in this litigation and the head of the Foreign Law Division of the Moscow College of Advocates, who are generally the forwarding attorneys to counsel for the foreign legatees in all such cases. Forwarding counsel accompanied Professor Berman upon his visits to the foreign legatees. The presence of this official during the interrogations necessarily poses grave doubts as to the verity of the answers received by Professor Berman.

A large sum of money was at stake and the presence of the Russian official during the interrogation must necessarily be deemed to have played some role in the nature of the responses. The sister stated she was 69 years of age on April 1, 1968, which would make her presently 72 years of age. She was divorced, had no children and lived alone on her pension. This pension is 92

rubles and 90 kopeks per month. Her total bank account contained approximately 2,353 rubles and 74 kopeks. Her food costs were 70 rubles a month. Her rent was 4 rubles and 52 kopeks per month, other living expenses were 10 rubles a month, and she was able to save a few rubles out of this small pension. When asked what she would do with the money if she received it, she indicated she would like more intensive medical care, would like to repair her apartment since the floor needed repair and the ceiling leaked, would like a decent sewing machine, a better refrigerator and better furniture, would like to buy a couch, would like to travel to Czechoslavakia and Rumania, and would then like to make gifts and to establish memorials for departed relatives. Professor Berman's summary with respect to the reasonable needs of the sister is contained on page 6 of his report and I quote from it as follows:

" I would estimate that Daria could immediately spend at least 10,000 dollars (or the ruble equivalent) on her own needs without changing her style of life — that is, while continuing to live quite modestly. She could buy a cooperative apartment for from 1,000 to 6,000 dollars (in dollars); or she could spend the equivalent in rubles (say, 3600 rubles) on repairs of her own apartment. She could easily spend another 3600 rubles immediately on needed furniture (rugs, couch, chairs, refrigerator, t.v. set, radio, sewing machine, dishes, kitchenware, art objects, etc.). She could easily spend the equivalent of 2000 dollars (1800 rubles) on clothing, medicines, trips to health resorts, and the like. In addition to spending at least 10,000 dollars (or the ruble equivalent) immediately, she could thereafter easily spend an extra three to four thousand dollars (2700 to 3600 rubles) annually on her own personal needs — again, without changing her style of life, that is, without living luxuriously. I believe that the immediate distribution to her of $40,000 net (that is, after lawyer's fees and any other costs) would enable her to live comfortably for the next ten years and might, indeed, be the only means of prolonging her life to that extent.

" (Incidentally, funds in foreign estates distributed to Soviet heirs are not subject to any Soviet tax.) "

From this interview with the sister which took place in the City of Tashkent, Professor Berman flew to Samarkand and was again accompanied by Soviet counsel during most of the ensuing interview with the brother, Flor, his wife, Maria, and their daughter, Nina. Flor was born in 1895. He is at this point approximately 76. He and his wife were living partly on his pension of 40 rubles and 60 kopeks a month; and he also had ten beehives from which he earned a little money. His daughter helped by giving them 60 rubles a month. He was completely without funds of any kind. His statement as to what he would do with the money is comparable to Tevya, the milkman, singing "If I Were a Rich Man", a fantasy of building many houses for himself and for many others, and similar illusionary acquisitions. Instinct in the entire conversation were the doubts of Professor Berman as to the realities of the legatees' being able to employ the moneys in the manner for which they hoped. We note the statement of Flor, for instance: "In Samarkand," he said, "with a lot of money one can get a good apartment. In Moscow, it is difficult even with a lot of money." I note as well the constant reiterated concern that the Soviet Government might well interfere with the realization of his hopes and aspirations were he to receive the large sums herein involved. Professor Berman's above-quoted summary with respect to the sister is likewise relevant and significant as to the brother.

I believe that in this preliminary report Professor Berman accurately appraised the true questions which exist in this case, to wit, the extent of such benefit, use and control, truly available, the hostility of the Soviet Government

to simple Soviet citizens' possessing such unearned large sums, and the range of possible purchases available for the reasonable benefit, use and enjoyment of the legatees. It is clear that Professor Berman's reports were fraught with many doubts and that any determination, predicated upon such reports to the bank, that these aged relatives in the Soviet could in accordance with the terms of the will have the benefit, use and control of the money *free of any doubt*, as required in paragraph " FIFTH " on the will, was an improvident exercise of discretion wholly unsupported by the evidence, in a situation in which, under SCPA 2218, the burden of proof is cast upon the foreign legatees.

The respondents rely heavily upon *Zschernig* v. *Miller* (389 U. S. 429) as authority for them to take, free of the operation of SCPA 2218 in this case. In my view, the *Zschernig* case is no such authority. That case merely held, in striking down an Oregon statute, that State courts and statutes could not involve themselves with questions of political ideologies, reciprocity between governments or similar matters, which are the pre-empted concern of the State Department of our Federal Government. In *Matter of Leikind* (22 N Y 2d 346), likewise mistakenly relied upon the respondents, the Court of Appeals expressly reaffirmed the continued viability of SCPA 2218 and the duty of the Surrogates to make inquiry into the factual circumstances of use, benefit, and control without animadversion to purely Federal political questions.

Recognizing the improbability of these humble Soviet citizens of such advanced age being able to usefully enjoy the benefit, use and control of these funds, the respondents have argued that the ability to give the money away is sufficient compliance with the use, benefit and control condition. The obvious intendment of both the will and the statute is, of course, to make certain that the moneys would be available for actual use by the legatees.

We are here confronted with a situation in which it might well be contrary to both testamentary purposes and legislative intendment to deal with this sum of approximately one-half million dollars as an indivisible unit. I believe we can give no fair construction to the statute or to the will other than that this testatrix and the New York State Legislature as well had no desire to prevent payment to the aged siblings residing abroad of such sums which they could reasonably use merely because they could not avail themselves of total use. There can be no question but that lesser sums of money readily convertible into consumer goods at fair value can be utilized by Soviet citizens. In the case of larger sums, however, a much different situation exists. It was the obvious intent of this testatrix that, if her brother and sister could not use this money, she herself would determine the substitute legatees and that her direction to the executor required that it do not give to this brother and sister moneys which they will have to give away because of inability to utilize them.

1. Upon this record, it is clear that the determination by the executor that the foreign legatees would have the benefit, use and control of the total legacies was wholly unsupported by the evidence and was an improvident exercise of discretion, in view of the obvious doubts with which it initiated this proceeding, and which doubts were substantiated by the initial and final reports received from Professor Berman.

2. Likewise, it is clear that a portion of the legacies can reasonably· be made available for the use, benefit and control of the aged siblings resident in the Soviet Union.

3. Similarly is it clear, as SCPA 2218 inhibits the transmission of all of these funds to these foreign legatees, that only such portions thereof should be released as can in effect be usefully utilized by such foreign legatees for

their own use and benefit. Any contrary holding is wholly unsupported by the evidence.

4. In view of the expressed intention of the testatrix that funds not so actually and naturally employable by her brother and sister should go to the substitute religious and charitable agencies selected by her rather than to substitute persons to be selected by the legatees, a hearing should be had to inquire into the factual verities of the ability to utilize such funds, the fund split accordingly in such amounts as the Surrogate should ultimately determine as appropriate for distribution to the foreign legatees, and the balance thereof should go to the substitute residuary legatees.

The decree of the Surrogate should, therefore, be reversed and the proceeding remanded for proof and determination not inconsistent with this opinion.

Martuscello, Shapiro and Gulotta, JJ., concur in memorandum; Benjamin, J., dissents and votes to reverse the decree and remand the proceeding to the Surrogate's Court for proof and determination not inconsistent with his dissenting opinion herein, in which Munder, Acting P. J., concurs.

Decree of the Surrogate's Court, Dutchess County, dated August 6, 1970, which construed the testatrix' will, after a nonjury trial, affirmed, with separate bills of costs to all parties appearing and filing separate briefs, payable out of the estate. [64 Misc 2d 665.]