Nathaniel T. Helman, J.
Petitioner, the New York Times Co., ¡seeks a review, pursuant to section Bl-9.0 of ¡the Administrative Code of the City of New York, of an order of the New York Commission on Human Eights (the Commission) dated July 19, 1974, which held that -all advertisements in the Times for employment in the Bepublie of South Africa had been “ expressive of discrimination,” and that the Times had “ aided and abetted,” discriminatory acts. The order, thereupon, enjoined the Times from printing any advertisement seeking employees or employment located in the Bepublie of South Africa.
A complaint filed with' the Commission on October 12, 1972 charged the Times with violations >of subdivision 6 of section Bl-7.0 of the Administrative Code which makes the “ aiding ” of any of the unlawful practices proscribed by that section an illegal act. The Times was charged with printing advertisements which express directly or indirectly limitations, specifications or discriminations as to race, color or national origin in violation of the Administrative Code provisions.
Eighteen separate advertisements, principally for teaching or managerial positions were .cited. It is undisputed that none of the advertisements contain any reference to race, color or creed. Typical of the advertisements are those relating to managerial positions which are headnoted “ General Manager, South Africa,” “ Mechanical Engineer, South Africa,” “ Area Manager, South Africa. ’ ’ The teaching positions were described as “University of Capetown Professors,” “ Sénior Lecturer in Piano, etc., Durban ”, “University of Capetown, South Africa, ¡Chair of Philosophy. ’ ’ Despite the absence of any reference to race in each of the advertisements, the complaints proceeded upon the theory ¡that the mere use of .the words “ South Africa ’ ’ in the advertisements constitutes an expression of discrimination.
After some preliminary proceedings the Commission held extensive hearings on January 14 and January 31 at which several witnesses were called, and some 15 exhibits introduced, *1048 and thereupon announced' its decision to the effect that: (a) the advertisements were “expressive of discrimination”; (b) the Times wds liable ¡an an “ aider and abettor ’ ’ of those persons who submitted the advertisements; (c) that the determination of the Commission did n ot constitute an intrusioh by it into .the foreign affairs of any ¡country; and (d) the First Amendment ¡afforded the Times no protection on tins action. All of the parties have recognized that ¡the precise questions here involved have never been previously adjudicated by any court, State or Federal.
A.
The specific provisions of section Bl-7.0 (subd. 1, par. [d]) upon which ¡this proceeding was based .state that it is an unlawful practice for any employer to circulate an advertisement ‘ ‘ which expresses, directly or indirectly, any limitation, specification or discrimination as to age, race, creed, color$ national origin or sex or any intent to make such limitation, ¡specification or discrimination, unless based upon a bona fide occupational qualification.”
Confronted with the words 1 ‘ expresses, directly or indirectly ’ ’ (emphasis supplied) the Commission nevertheless held that specification of South Africa as the location of the employment constituted an “ expression ” of discrimination since the words “'South Africa” have come to be commonly understood to be synonymous with white supremacy. It accepted the view of counsel for the respondents and interveners ¡that the words “ South Africa” were code words intended to communicate a meaning of discrimination directly or indirectly. Adopting the thesis that the ¡system of “ apartheid ’ ’ practiced in South Africa automatically precluded the employment of any black American who would respond to any of the advertisements, the Commission construed various acts ¡and ¡statutes of the ¡South African government as in effect requiring a compulsory discrimination in employment.
Without analyzing (as both counsel have done with opposite conclusions) the South African statutes involved, it is significant that none of the advertisements make any reference to race, ¡and that the Times can hardly be .charged from the language of the ¡advertisements themselves with evincing an intent, directly or indirectly, to participate in a program of discrimination. Nor can the Commission’s decision that the publishing of the advertisements rendered the Times liable as an “ aider or abettor” be sustained, as those terms ¡are used in section B-17.0 of the Administrative Code. In the case of National *1049 Organization for Women v. State Div. of Human Rights (40 A D 2d 107, 116-117) the court said:1 ‘ To ¿old that the respondent Gannett aided and abetted an unlawful discriminatory act in .violation of subdivision 6 of .section 296 of the Executive Law requires that it be established that there was a knowledgeably and intentional participation .on its part in the unlawful conduct charged.” (Emphasis supplied.) Put another way, “ ‘ an aider .and abettor must share the intent o,r purpose of the principal actor, .and there can be no partnership in an act where there is no community of purpose’” (National Organization for Women v. Buffalo Courier-Express (71 Misc 2d 917, 919). The reasoning of the Commission seems to have been that ¡since New York residents “ perceive ” of .South Africa as being discriminatory in its hiring practices, injunctions may thereby be issued against publication of any advertisement for employment in that country. Such a conclusion cannot on ¡this record be sustained, particularly in view of the jurisdictional limitations imposed by the statute which created the Commission.
B.
The Commission’s response to the .contention of petitioner that the exercise of its jurisdiction involved ¡an unconstitutional interference with the foreign affairs powers of the Federal Government, was, ‘ ‘ We are not asked to grant any relief -running against the exercise of power by a foreign sovereign or by its agents.” It viewed petitioner’s position as ■“ really being based upon the foreign location of the employment it chooses to advertise.” It held the case of Matter of South Africa Airways v. New York State Div. of Human Bights (64 Misc 2d 707) not germane although that decision discusses many of the questions here involved.
In that case South African Airways. (SAA) brought an article 78 proceeding asking ¡the court to enjoin the State Division of Human Rights from conducting a hearing involving the placement -of advertisements by SAA for employment opportunities which were admittedly not available on a “ nondiscriminatory ” basis. Since the airline was owned by the South African government, the court held that it was that government’s policies in granting visas which were in issue, and not the airline’s, thus barring the Commission from intervening in another government’s foreign policy. The court then said {supra, pp. 710-711): “ On the face of the complaint it is thus apparent ¡that any action which .respondent could take would necessarily be directed against a foreign government or its consular agent, *1050 exercising sovereign power. This it may not do, for such action would interfere with an act of state and with the foreign policy of the United States, which has seen fit to permit petitioner to operate in and out -of the United 'States, carrying passengers to 'and from the Republic of 'South Africa. Foreign policy is a Federal concern, not amenable to State action.”
The significant feature of that decision, however, was that the court construed the complaint against SAA, as one really directed at the South African government, notwithstanding that it was SAA which advertised in New York and' had transported passengers from New York. The court thus applied the Federal “ act of State ” doctrine that a domestic tribunal may not review the act of a foreign government even when that act violates public policy (Banco Nacional de Cuba v. Sabbatino, 876 U. S. 398). In the same spirit, 'the New York ¡Court of Appeals declined to examine Cuban currency laws which were charged, in effect, with confiscating property of United States citizens, the court there saying: ‘‘ Even if, therefore, we were to assume that the decision of the .Cuban instrumentality here involved was contrary to our public policy, ¡such considerations would not affect our determination. As the Supreme Court observed in the far harsher context of Sabbatino (pp. 436-437), ‘ However offensive to the public policy of this country and its constituent States an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application. ’ ” (French v. Banco Nacional de Cuba, 23 N Y 2d 46, 56.)
By its determination, the Commission, in effect, was questioning the employment methods and practices of a foreign government. The vivid description given by complainant’s witnesses at the hearing concerning the discriminatory manner of distributing recreational, sanitary and other facilities in South Africa, only emphasized the interest of the Commission in the governmental functions and practices- of a foreign country.
Economic sanctions should be adopted, wherever necessary, on a Federal level -and not by a local ¡antidiscrimination agency which at best can only become involved in international problems far removed from the scope of its limited jurisdiction. (See Zschernig v. Miller, 389 U. S. 429, 433, where the -court affirmed the exclusivity of Federal power in foreign affairs, limiting their consideration by local and ¡State bodies to “ no more than a routine reading of foreign laws.”)
*1051 0.
While ■determination of the consitutional questions ¡raised by the Times is not essential to the court’s ultimate conclusion, the subject matter has been discussed at ¡some length by both parties, and the Times would appear to be entitled to an adjudication of the constitutional issues here involved. It is argued that the Commission’s decision and order, enjoining publication of any employment advertisements from South Africa, violate the First and Fourteenth Amendments since they involve governmental control of decisions of the press ¡as to what may be published. Excepting with .respect to such publications as are discriminatory on their face, or which violate statutes relating to discrimination, the general rule is that Government and the press have a “history of disassociation.” (Associates & Aldrich Co. v. Times Mirror Co., 440 F. 2d 133.)
Principal reliance is placed ¡by respondent on the case of Pittsburgh Press Co. v. Human Relations Comm. (413 U. S. 376, 379) where the newspaper was accused of carrying illegal advertisements for job opportunities with the listing “ Jobs — Male Interest” and “ Jobs — Female Interest.” In enjoining the listing of such advertisements in sex designated columns the court held there was no abridgement of the paper’s First Amendment rights in that such employment advertisements were “ classic examples of commercial speech ” not entitled to First Amendment publication (p. 385, emphasis supplied). There, as here, the newspaper contended that the imposition of restraints would interfere with editorial judgment in matters political and diplomatic.
The court ¡there said (supra, pp. 387, 391):
‘ ‘ we are not persuaded that either the decision to accept a commercial advertisement which the advertiser directs to be placed in a sex-designated column or the actual placement there lifts the newspaper’s actions from the category of commercial speech.”
“We hold only that the Commission’s modified order, narrowly drawn to prohibit placement in sex-desigated columns of advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of Pittsburh Press.”
The clear meaning of the views expressed in that case is that when the commercial help-wanted employment advertising policy of a newspaper demonstrates an illegal commercial activity prohibited by an antidiscrimination agency, an injunction will not violate the First Amendment rights of the newspaper. The holding in the Pittsburgh case does not place *1052 an intolerable burden on the press .since the limitation is only on the printing of those advertisements which run counter to the meaning of section Bl-7.0 (subd. 1, par. [d]) of the Administrative Code. It may be noted that in the Pittsburgh case, 'Chief Justice Burger in his dissent argued that it was improper to subject the press to .summary judgment in having made ‘ ‘ an ‘ unlucky ’ legal guess.” (4Í3 U. .S’. 376, 396-397, supra.) The answer of the majority was that judicial review of commission orders would guard against any danger of abuse.
Since the advertisements here involved .fell within the category of commerical advertising, they were not within the purview of the protection afforded by the First and Fourteenth Amendments. There remains, however, the significant fact that the present advertisements made no reference to race or color directly or indirectly. This fact combined with the expressed reluctance of our courts to invade the policies of other nations, supports the position of the Times that no discrimination statute was violated by the newspaper.
D.
Discrimination and ethnicity manifest themselves in many ways and in many places. Varying only in intensity, conflicts have appeared between Anglophone and Francophone in Canada, Walloon and Flemish in Belgium, .and Chinese versus Malay in Malaysia. An Indian minister recently assured his parliament that1 ‘ Muslims, Christians, and other minorities will receive their due and proper share of railroad jobs. ’ ’ In Kenya, Indians were expelled because they were better at trading than the Africans — .so also in Uganda where Asians were similarly expelled. Substantial parts of the labor forces of European countries are made up of foreign workers who daily feel the weight of ethnic .and racial discrimination which confine them to menial tasks.
For the Commission to enter every foreign area where patterns of discrimination appear by imposing restraints on the solicitation of employees based in the United States, through the medium of fair advertising, involves, an assumption of jurisdiction which was. certainly never contemplated by the legislative body which created the Commission. No justification for this extension of its powers can b.e found either in the statute or in any of the Federal or State decisions which have touched this subject.
Accordingly, the order of the Commission will be vacated and the relief .sought by petitioner gr anted.