Jasen, J.
We hold that advertisements of employment opportunities located within the Republic of South Africa which merely refer to that country as the situs of the employment and which do not recite, on the surface, any discriminatory conditions do not express discrimination within the meaning of the New York City antidiscrimination laws. We also hold that a newspaper which publishes such employment advertisements does not thereby aid and abet the invidious discrimination practiced within the Republic of South Africa under color of national law and policy.
Between August, 1970 and December, 1973, the New York Times published at least 19 separate advertisements of employment opportunities available in the Republic of South Africa. Nearly half sought to employ persons for managerial positions in private industry. The remainder advertised openings on the faculties of various South African universities. The advertisements ranged in size from a short, six-line, one column notice to a full-sized, four column, large-print box display. Some recited lengthy job descriptions and employment-related qualifications; others did not. None of the advertisements contained references to race or to racially based discrimination. In fact, two advertisements for international corporations seeking general managers for South African subsidiaries referred to the corporations, perhaps incongruously, as equal opportunity employers. All of the employment opportunities were located within the Republic of South Africa. Interested applicants were to write to either a New York Times box number or to specified addresses in New York, Washington, London or in South Africa. In one instance, prospective employees were to arrange for a personal interview to take place in New York City by calling a listed New York City telephone number.[1]
The American Committee on Africa wrote to the Advertising Acceptability Department of the New York Times on several occasions, complaining that "employment in the Republic of South Africa is subject to discrimination on the basis *347 of race by law.” The Times continued to publish employment advertising for South African positions in reliance on its policy, as expressed in a newspaper editorial, that the Times "should keep its advertising columns open to all points of view, no matter how strongly it disapproves of them.” (The Freedom of Advertising, New York Times editorial, Dec. 28, 1961.)
On October 12, 1972, the American Committee on Africa, two other groups and one individual filed a complaint with the New York City Commission on Human Rights. As subsequently amended, the complaint alleged that "as a matter of law there exists in the Republic of South Africa systemic discrimination in employment based on race, color or national origin”, that the purpose and effect of these laws is to deny black and nonwhite workers equal access to jobs and to deny them equality of working conditions, and that advertisements for employment in South Africa express this discrimination. (Emphasis added.)[2] The commission found probable cause to believe that the Times in publishing the advertisements aided in an unlawful discriminatory practice and that the Times knew or should have known of the South African policy of apartheid and its effects on employment practices. The Times moved to dismiss the complaint on the grounds that the commission was without jurisdiction to intrude on matters of foreign policy and that the commission could not enter an order which would violate the Times’ First Amendment rights. The motion was denied. A petition for a writ of prohibition based on similar contentions was dismissed by Supreme Court, New York County. (Matter of New York Times Co. v City of New York Comm. on Human Rights, 76 Misc 2d 17.)
At a commission hearing, copies of various South African statutes were introduced into evidence. Former South African attorneys, one white and one black, testified as to the nature and effect of these laws. The import of this testimony was that it is the official policy of the South African government to classify its people into three separate categories: white, Bantu (native African) and colored. With rare exceptions, only whites are permitted to hold supervisory or skilled positions, to attend college and to live in preferred areas. Whites are given preferential treatment in all facets of public and private *348 accommodations; whereas, nonwhites may hold only menial jobs at poverty level wages, are required to live in restricted areas with substandard housing and are forced to utilize inferior public accommodations and facilities. The complainants introduced testimony of American blacks that the discriminatory, apartheid policy of the South African government is a matter of common knowledge in the black ‘community. Blacks would expect to be discriminated against in seeking employment in South Africa and, even if tendered employment, would not move to South Africa because of the oppressive living and working conditions to which nonwhites are subjected. This evidence was not disputed by the Times. Instead, the Times introduced evidence that many other Nations in Europe, Asia and Africa discriminate on the basis of race, religion or sex.
At the close of the proceedings, the commission found that it was not necessary to make any findings of fact. It concluded, from the undisputed evidence, that the extensive system of racial segregation and discrimination employed in the Republic of South Africa is well known and that the term "South Africa” "has come to have a denotative meaning, in the common understanding, other than its geographical reference —i.e., the principle of white supremacy”. The commission rejected the Times’ First Amendment and foreign policy arguments and ordered the Times to cease and desist from printing advertisements which seek employees for employment located in the Republic of South Africa.
Special Term granted the Times’ petition for review and set aside the commission’s order. The court ruled that the commission, in effect, had questioned the employment methods and practices of a foreign government and the commission’s jurisdiction did not extend to activities conducted within other countries. (79 Misc 2d 1046.) The Appellate Division affirmed the judgment of Special Term, holding that the "language of the advertisements is not such as to indicate an intent on the part of petitioner to participate in a program of discrimination.” (49 AD2d 851, 852.) The Appellate Division granted the commission permission to appeal to our court, certifying the existence of questions of law which the Court of Appeals ought to review. We would affirm the order of the Appellate Division but on other grounds.
Before proceeding to a discussion of the significant issues actually presented by this case, it is useful to point up the *349 issues that are not presented and on which we express no view. It is not contended that the New York City antidiscrimination laws are an invalid exercise of the municipal police power. Nor is it contended that the application of such laws to international transactions would be an unconstitutional municipal regulation of foreign commerce. Similarly, we have not been presented with an argument that extraterritorial effect should be given to the laws of the Republic of South Africa on the ground that the legality of terms and conditions of employment should be measured by the law of the country of employment. Hence, our review is limited to a determination of whether there is support, as a matter of law, for the commission’s finding that the Times violated the antidiscrimination laws and whether such finding would be precluded by either principles relating to foreign policy or by principles relating to freedom of the press.
At the threshold, it is also necessary to discuss the relevant standard of review. The complainants and the commission contend that we are limited to a narrow scope of review and the dissent apparently accepts that view. We disagree. The findings of the New York City Commission on Human Rights are conclusive, if supported by sufficient evidence on the record considered as a whole. (Administrative Code of City of New York, § Bl-9.0.) Where the commission has made findings of fact, the sole question before the reviewing court is whether there is sufficient evidence in the record to support the administrative findings. (Matter of Pace Coll, v Commission on Human Rights of City of N. Y., 38 NY2d 28, 35.) However, the commission, in this proceeding, did not make any findings of fact. Rather, the commission’s determination was based on conclusions of law drawn from an undisputed set of facts. Indeed, the complainants’ complaint was itself predicated upon matters of law. Under these circumstances, it would be both wrong and inappropriate to apply the substantial evidence test. The issue is simply whether the commission properly analyzed the law and we hold that it did not.
The New York City antidiscrimination laws prohibit employers or employment agencies from printing or causing to be printed "any statement, advertisement or publication” which "expresses, directly or indirectly, any limitation, specification or discrimination as to age, race, creed, color, national origin or sex, or any intent to make such limitation, specification or discrimination, unless based upon a bona fide occupational *350 qualification.” (Administrative Code, § Bl-7.0, subd 1, par [d].) It is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden” by the terms of the antidiscrimination laws. (Administrative Code, § Bl-7.0, subd 6.) As a matter of law, we conclude that the advertisements printed in the Times did not express discrimination, directly or indirectly, and that the Times could not be held for abetting their publication.
By the very terms of the municipal ordinance, a violation occurs if an employer prints or causes to be printed an advertisement that contains an expression, direct or indirect, of discrimination. The advertisements complained of in this proceeding do not express any discrimination of any kind, directly or indirectly. The complainants, nevertheless, would draw an inference, as a matter of law, that since the location of the employment was a country that discriminates on the basis of color, advertisements for employment located within that country must, therefore, carry with them an implication of discrimination. However, the test under the advertising subdivision is not whether actual discrimination is practiced. The standard is whether the advertising expresses discrimination, directly or indirectly. The advertisements at issue here never once referred, even obliquely, to any discriminatory limitations.
There are, of course, cases which establish, quite rightly, the principle that the antidiscrimination laws cannot be avoided by the expedient of using carefully designed code words. For example, use of the words "selected clientele” in resort advertising cannot be sustained since, as a practical matter, this phrase indirectly expresses the practice of religious and color-based discrimination. (See Camp-of-the-Pines v New York Times Co., 184 Misc 389.) If an advertiser could use code words as a substitute for terms clearly proscribed by law, the law would be nullified for all practical purposes. (United States v Hunter, 459 F2d 205, 215, cert den 409 US 934.) Here, complainants argue that the very name of a particular country, South Africa, is a recognized code word for a system of discrimination practiced in that country. However, mere geographical reference to the situs of employment does not carry with it an expression of discrimination, directly or indirectly; nor does the reference to geographical location necessarily imply that the prospective employer engages, in New York, in practices required, approved, or condoned by the *351 laws of South Africa. Moreover, complainants would blur the important distinction between code words, deceptive tokens added to coyly and subtly communicate discriminatory criterion, and essential employment information that the employer may legitimately communicate to a prospective employee. Thus, without setting forth the location of the prospective employment, an employment advertisement would be incomplete and without value to both the would be employer and the prospective employee. Code words are discriminatory additions to otherwise complete advertisements; the purpose is to signal the existence of an unlawful criterion. While employment location is an essential ingredient to complete lawful advertising and its mention is crucial to the advertisement, a discriminatory code word adds nothing but invidious unfairness. It is the code word, not the geographic reference, which expresses discrimination. Thus, mention of South Africa does not express discrimination, either directly or through an indirect deceptive and unnecessary code word. In addition, it may well be that employment solicitation at the place of solicitation, New York, is nondiscriminatory, while the actual discrimination occurs at the place of employment, South Africa. Indeed, complainants have not submitted any proof that any of the employers who advertised in the Times practiced discrimination in New York in seeking employees for South African employment. Even with respect to the South African universities, there is no evidence that such institutions, whether operated by the government or by private organizations, refused or have refused to consider the applications of nonwhite Americans, especially nonwhite New Yorkers. Crucial also is the fact that, in this instance, our inquiry, and that of the commission, is confined to employment-related discrimination and not to an analysis of an entire way of life.
As for the dissenters, it should be plain enough that the ordinance at issue here prohibits the expression, directly or indirectly, of discrimination in employment advertising. The Times may be held as an aider and abettor of discrimination only if it published advertisements that expressed discrimination. None of the advertisements do so.
More important, the contention that the term South Africa works a code word for discrimination is not at the heart of this case. The reality is that complainants seek to impose an economic boycott aimed at the present government of the Republic of South Africa. An aspect of the boycott is the *352 sought-after prohibition against the publication of advertisements for employment opportunities in South Africa. Without expressing disapproval of the goal of the complainants and without expressing approval of the invidious practices of the government of the Republic of South Africa, we would conclude that a city agency was without jurisdiction to make and enforce its own foreign policy. ,
The government of the Republic of South Africa is, at the present, the legitimately constituted governmental authority for that country and has been recognized as such by our government. Although we believe, as a matter of principle, that the govérnments of all Nations should act in accord with natural justice, fairness and equity, it is beyond the province of the State courts, much less municipal agencies, to sit in review of the laws of foreign governments. ’’Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.” (Underhill v Hernandez, 168 US 250, 252.) Although State courts have ample authority to read, construe and apply the laws of a foreign country in a routine fashion, they may not launch inquiries into the righteousness of foreign law, thereby affecting "international relations in a persistent and subtle way”. (Zschernig v Miller, 389 US 429, 440.) Even long-standing State regulation of traditional fields of law, such as the rules governing the descent and distribution of estates, must fall by the wayside if enforcement of State regulations would "impair the effective exercise of the Nation’s foreign policy.” (389 US, at p 440.) The basis for this principle is that experience has established that real or imagined wrongs perceived by another government may create significant international disputes, perhaps even resulting in armed conflicts. (Hines v Davidowitz, 312 US 52, 64.) The peace and security of the United States has not been left to the whim of but one State whose actions would have consequences, perhaps dire, for all the States. The Federal Government represents the collective interests of all the States and it has been entrusted with "full and exclusive responsibility” for the conduct of foreign policy. (312 US, at p 63.) The Federal power must "be left entirely free from local interference”. (312 US, at p 63.)
The principle that States should not interfere with the *353 foreign policy authority of the Federal Government has found frequent expression in our decisions. Indeed, the Supreme Court has described an early New York decision (Hatch v Baez, 7 Hun 596, 599), as having "foreshadowed” the classic case of Underhill v Hernandez (168 US 250, supra). (Banco Nacional de Cuba v Sabbatino, 376 US 398, 424.) Whether a foreign country has been recognized by our Government or not, it is impermissible for a State court to review foreign actions and policies. To do so would "’vex the peace of nations’”. The States may not bind the State Department lest unwillingly the Federal Government "would find itself involved in disputes that it might think unwise”. (Wulfsohn v Russian Republic, 234 NY 372, 376, app dsmd 266 US 580.) "The question is a political one, not confined to the courts but to another department of [the Federal] government. Whenever an act done by a sovereign in his sovereign character is questioned it becomes a matter of negotiation, or of reprisals or of war.” (234 NY, at p 376.)
It was beyond the ken of the city Commission on Humán Rights to enforce local antidiscrimination laws by imposing an economic boycott of the Republic of South Africa. In this very case, the commission conducted an inquiry that might have been considered offensive by the Republic of South Africa and which might have been an embarrassment to those charged with the conduct of our Nation’s foreign policy. The true danger is that if New York City could do this in one instance, it could do so in many instances. Each locality in each State may not adopt its own foreign policy. This would be disastrous, not only because of multiplicity and divergence of policies, but because local decisions are often influenced by pragmatic local considerations which are not necessarily controlling or even relevant to national policy as determined by the Federal Government at Washington.
If the national government deems it advisable to take action against the Republic of South Africa, it has ample means at its disposal. Moreover, the Federal authorities have an unrestricted number of options available, including the possibility of taking collective action with other Nations in the world community. However, this is not a matter of proper state judicial or administrative concern.
Finally, in view of our disposition of the case on other grounds, it is unnecessary to consider or decide the First Amendment issues advanced by the Times.
The order of the Appellate Division should be affirmed.
*354 APPENDIX
The following are selected advertisements of the type complained of.

*355

*356

. Several of the advertisements are reprinted, for illustration purposes, in an appendix to this opinion.

. The original complaint alleged that discrimination existed as "a matter of law and practice”. The complaint was subsequently amended to delete the words "and practice”.