OPINION OF THE COURT
William B. Braatz, S.
By petition filed April 8, 1994, Bonnie H. Renoir, the *806 petitioner herein, makes application to elect against the will of the above-named decedent as a surviving spouse, based upon her alleged common-law marriage to the decedent in Paris, France. In a decision entered October 24, 1994 this court stated that the threshold issue of petitioner’s standing to elect against the will as a surviving spouse based upon an alleged common-law marriage to the decedent needed determination. Counsel were directed to submit pretrial memoranda of law addressed to the issues, including any conflict of laws arguments. A conference was held, and a time frame established for submission of memoranda of law.
Since then, the court learned that an additional interested person, Giselle Huyot, had never been served with notice of the proceeding and, accordingly, the petitioner was directed to serve a supplemental citation or to file a waiver of citation. A waiver of appearance and authorization of attorney was filed by Giselle Huyot in Putnam County Surrogate’s Court on February 22, 1996. Additionally, a notice of appearance was filed by her attorney, who indicated that he had no intention of submitting papers on the issues presented and asked that the matter be deemed fully submitted.
FACTUAL BACKGROUND
According to the submitted and uncontroverted affidavits, the petitioner and the decedent lived together in Paris, France, from November 24, 1984 to approximately August 1988, calling each other husband and wife. From August 1988 to approximately November 19, 1989 the petitioner and decedent lived together in Carmel, New York. On or about November 19, 1989 the petitioner "was cast out” of the residence in Carmel. After November 1989 until the decedent’s death on April 29, 1993 the petitioner had made "intermittent attempts” to reconcile with decedent. Respondents have conceded that for the purpose of determining the threshold question of the petitioner’s standing to elect against the will the court shall assume the truth of the allegation that petitioner and the decedent lived ”en concubinage” for a period of time in France and during that time she would have been considered to be the decedent’s concubine under French law. The relationship was terminated in 1989 against the petitioner’s will and no matrimonial action was ever commenced by either party against the other. The decedent died on April 29, 1993.
*807 DISCUSSION AND CONCLUSION
Petitioner and respondent have both submitted affidavits by their respective experts in French law. The petitioner’s expert, Jacqueline Rubellin-Devichi, is currently a professor at the University of Jean Moulin in Lyons, France, and an expert in family law. The respondent’s expert, John P. Heinzen, is an attorney qualified to practice in the courts of France and the United States Supreme Court. He indicates that "a substantial part of * * * [his] practice has been in the field of marital relations.” (Heinzen, affidavit of French law, Mar. 21, 1995, at 1.) One thing the experts appear to agree on is that there is a relationship called "concubinage”[1] which is created by a man and a woman who choose to live together and which is terminable at will.[2]
The petitioner’s expert states that: "not only is * * * [concubinage] admitted as a style of conjugality, as encompassing as marriage, or a family, but the jurisprudence and French Law often give preference to the * * * [concubine], even still married elsewhere, or in other words, adulterous over the wife; it’s especially true for liveralities [sic]” (English translation of petitioner’s expert, at 3).
Later, Ms. Rubellin-Devichi discusses the effects produced by the concubinage relationship in France. She indicates: "that the * * * [concubine] who loses her * * * [concubin] at the fault of a third party (car accident, for example) is indemnified as if she was the spouse * * * that the * * * [concubine] has the right to stay in the home (domicile) or to continue in the contract as if she were the spouse” (English translation of petitioner’s expert, at 5 [emphasis added]).
*808 "In the matter of social security, health and maternity insurance is exactly the same for the two categories of the couple, in marriage or out of marriage: * * * [the concubine] is the married wife and married wife are the exact same beneficiaries with the same title [sic] * * * [I]t is true that the pension of reversion and the death insurance are not given to the * * * [concubine] in the general regime, but they exist in complimentary regimes; it is false to say that the * * * [concubine] has no rights after a break-up or after the death. If there is a break-up by the fault of the * * * [concubin], there are damages and interest, often very high, to whom is owed or to whom are due; after the death, the courts allocate important or great sums taking into account the help given by the * * * [concubine], on the basis of the business principle, of the enrichment without cause, of the DeFacto situation; the * * * [concubine] can use the name of her companion and she can inherit from him. It’s true that the rights of succession are raised to 60%, despite the fact that for the spouse, they can obtain 40%, but that is really not proof of the non-recognition of * * * [concubinage]! As much as it is to emphasize that the married woman does not come into the inheritance of the husband if he does not want it, and can perfectly not have rights to anything, while the * * * [concubine] comes under the inheritance if the * * * [concubin] has made a Will in her favor.” (English translation of petitioner’s expert, at 7.)
Ms. Rubellin-Devichi concludes as follows: "I very solemnly affirm, considering myself an expert in French Family Law, that our law knows two models of conjugality, marriage and * * * [concubinage], and that * * * [concubinage] has been recognized for a long time in our law * * * In the examined case, bonnie rendir should receive:
"a/the liberality that was given by order of payment, of the living Mr. Huyot, and that is founded more on the perfectly praiseworthy motive that would be very appreciated by French Judges.
"b/In the title of enrichment without cause (of Mr. Huyot), a sum that the Courts would consider an account held to the age and duration of the * * * [concubinage]; in effect, Bonnie Renoir held the place as mistress of the house, helping him in his professional life and worldly activities, as important in the profession that he was in.” (English translation of petitioner’s expert, at 8-9.)
The affidavit of French law submitted by John P. Heinzen, the respondents’ expert, indicates:
*809 "There is only one form of marriage which can be performed in France. This is the Civil Marriage performed by an 'Officier d’Etat Civil’ (i.e. the Mayor, one of his deputies of the commune, i.e. township) of which at least one of the spouses is a resident on the date when the bands are posted * * * (Article 165 of the French Civil Code) * * *
"The French Civil Code provides that a marriage can only be terminated by the death of a spouse or a judicially rendered Divorce Decree, (Article 227 of the French Civil Code) * * *
"A validly performed marriage creates both rights and obligations in favor and on the part of each spouse, which are set forth in the French Civil Code (Article 203 and following) * * *
"When two persons cohabit in France without being married, they are said to be living 'en concubinage,’ i.e., as companions * * *
"There are no laws or regulations in France which regulate the status of 'concubinage’ and each of the companions may terminate the relationship at any time. Such termination does not require any judicial decree and it does not per se give rise to any claim to alimony or damages on the part of the concubine who is left by her companion.
"On the death of her companion, the surviving concubine has no inheritance right or claim whatsoever in her deceased companion’s estate unless, and only to the extent, she is named as a legatee in the decedent’s Will and even then, the surviving concubine may not be left more than the decedent may leave to any third party. The widow, on the contrary, in addition to her share of the community property, benefits from intestate inheritance rights, the extent of which depends on the presence of children or other relatives of the decedent. (Article 755 and fol. of the French Civil Code) * * *
"If the concubine or her companion should be married to someone else during the cohabitation the concubinage relationship is deemed to be adulterous, but no prosecution for bigamy, a crime under French Law, would be possible.
"French law provides that gifts between spouses otherwise than by ante-nuptial agreement are always revocable at any time, while gifts between a concubine and her companion, like gifts between unrelated persons, are irrevocable * * *
"The concubinage relationship does not give rise to any patrimonial right, or right to support, in favor of the concubine against her companion or vice-versa. All the concubine may *810 claim are damages in tort if she can prove that the conduct of her companion is wrongful and caused her damage, or damages for breach of contract if he fails to abide by contractual commitments provided such commitments are not legally null and void as being designed to create, maintain or remunerate the immoral concubinage relationship * * *
"Thus, under French Civil Law, there is neither identity nor similarity between the status of a concubine and that of a married woman.” (Respondent’s affidavit of French law, Mar. 21, 1995, at 2-3.)
Neither the petitioner nor the respondents has included as part of their exhibits concerning French law copies of the French Civil Code, or copies of any of the "extensive” decisions apparently discussing the concubinage status referred to by the petitioner’s expert. Petitioner has primarily submitted excerpts from articles written by her expert concerning family law in general and concubinage in particular.
Whether the decedent and the petitioner entered into a valid common-law marriage is to be determined according to the law of the jurisdiction in which such marriage is purported to have occurred. (Matter of Watts, 31 NY2d 491, 495 [1973].) If France recognizes this relationship as a marriage, then New York may recognize it for estate purposes. The difficulty here, however, is that unlike common-law marriages contracted in the States of the United States which continue to recognize common-law marriage, and have precise standards for determining whether or not a common-law marriage has occurred, the law in France speaks of two distinct types of relationships: "concubinage” and marriage. What both experts have stated— although Ms. Rubellin-Devichi does not analyze the implication of her statements — is that these are distinct relationships with distinct rights attached to them. This is the larger unspoken gloss on those cases in the New York courts recognizing common-law marriages contracted in other jurisdictions: the foreign jurisdictions recognizing common-law marriage treat the participants in the same fashion as those who’ve married formally. "Marriage” is "marriage” for all purposes, including the ability to enter into the relationship (cf., Matter of Abbott, 189 AD2d 709 [1st Dept 1993] [decedent could not be common-law spouse of claimant since claimant never divorced his wife; thus he could not elect against decedent’s will]; Matter of Benjamin, 34 NY2d 27 [1974] [since decedent did not divorce common-law spouse prior to ceremonial marriage to another, the common-law spouse was the widow in rival claim *811 for letters of administration]), spousal maintenance (Cross v Cross, 102 AD2d 638 [1st Dept 1984] [plaintiff obtained spousal maintenance pendente lite having established prima facie that she was the common-law spouse of defendant under laws of Pennsylvania and the District of Columbia]), and death benefits (Matter of Mott v Duncan Petroleum Trans., 51 NY2d 289 [1980] [Workers’ Compensation Board directed to apply Georgia law to determine whether claimant common-law spouse of decedent member]).
Most compellingly on point is a case decided by the Surrogate in Queens County, Matter of Jenkins (133 Misc 2d 420 [1986]). In Matter of Jenkins, the petitioner sought leave to elect against the will of the decedent alleging she was the surviving spouse based upon an Israeli common-law marriage. In determining that the petitioner could not elect against the will, the Surrogate stated: "the relationship referred to in the two statutes in question and the Israeli statutes in general dealing with the relationship of a man and woman who are cohabiting in a common household do not create a state of marriage, equivalent to a common-law marriage or a ceremonial marriage. The parties are not married and are not each other’s spouse. Rather, the statutes confer certain rights in Israel. Some of these rights may be similar to or the same as those of married couples but the conferring of these rights does not in Israel give the parties the status of husband and wife.” (Matter of Jenkins, supra, at 426.)
In reaching that determination, the Surrogate examined two Israeli statutes proffered by the parties’ experts, setting forth certain rights to which individuals who live together " 'as husband and wife in a common household’ ” become entitled to, upon the death of the other. (Matter of Jenkins, supra, at 421.) The experts drew conflicting conclusions as to whether or not the statutory or common-law framework in Israel created an ability to enter into a common-law marriage in Israel. The court noted that despite the disagreement of the experts, it was the court’s function to determine the meaning and effect to be given to the statute and the court " 'must routinely construe foreign law in the resolution of controversies properly before [it]’ (Zschernig v Miller, 389 US 429, 442 * * *).” (Supra, at 422.) The court then set out to define marriage as recognized in the State of New York, including recognition of common-law marriages, and compared the applicable provisions of the Israeli Code.
Similarly this court must examine how this relationship would be viewed in France and can only conclude that there is *812 a distinction between "marriage” and "concubinage” that is more than mere language. While the petitioner may have some rights under French law as a result of the relationship she enjoyed with the decedent, they are not the same rights as those granted to a spouse in France who is a partner in a "legal” marriage. If France does not accord her the same legal status, then how can the State of New York grant her more rights than those she would be granted in France? She cannot be deemed to be a "surviving spouse” entitled to elect against decedent’s will given that the jurisdiction from which she claims to have arrived at that status does not recognize a true common-law marriage equivalent to those recognized by American jurisdictions that do recognize such a form of marriage.
Accordingly, the petitioner’s application to elect against the will as a surviving spouse of the decedent herein is hereby dismissed.

. Throughout the translations proffered by the petitioner the words "en concubinage,” "concubine” and "concubin” have been translated as "common law marriage,” "common law wife” and "common law husband,” respectively. This choice of translation not only begs the question, but makes for distracting reading. The French/English dictionary definition of "concubin” is "1. Concubine; partner. 2. JUR. partner cohabitee,” and that of "concubinage” is "1. To live as man and wife, to cohabit. 2. JUR cohabitation, cohabiting; notoire common-law marriage.” (Petitioner’s mem of law.) Such a dictionary’s purpose is to assist the foreign reader or listener in understanding French terms or concepts, many of which have no translation, as any student of colloquialisms would know. Accordingly, the court has substituted the French words for the selected English translations where they appear in the quoted language from the parties’ submissions.

. The petitioner indicates in her reply memorandum of law that "there is a common-law divorce procedure, just as there are other regulations of the common law marriage.” (Reply mem, at 4.) No copies or translations delineating exactly what this procedure is have been submitted.